**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 27 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EDWARD L. RIVERA,

      Plaintiff - Appellant,

v.

THE CITY AND COUNTY OF
DENVER, a municipal corporation,

      Defendant - Appellee.

No. 03-1059

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 01-WM-1215 (CBS))**

---

Barry D. Roseman of Roseman & Kazmierski, LLC, Denver, Colorado, for
Plaintiff - Appellant.

Richard A. Stubbs, Assistant City Attorney (J. Wallace Wortham, Jr., City
Attorney, and Robert D. Nespor, Assistant City Attorney, with him on the brief),
Denver, Colorado, for Defendant - Appellee.

---

Before **KELLY** and **HARTZ** , Circuit Judges, and **CASSELL** , District Judge [*].

---

**HARTZ** , Circuit Judge.

---

[*]The Honorable Paul G. Cassell, United States District Judge for the
District of Utah, sitting by designation.

After Plaintiff Edward L. Rivera was terminated from his employment with the City and County of Denver (the City), he brought this action against the City under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e-1 to 2000e-17, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, alleging that he was discharged based on his national origin and age. The City responded that he was discharged because he falsely reported doing work and then induced another employee to lie in his behalf. The district court determined that Plaintiff's evidence failed to create a genuine issue that the City's proffered reason was pretextual, and granted summary judgment for the City. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I.    BACKGROUND

Plaintiff is an Hispanic male, born on July 15, 1953. While employed by the Wastewater Management Division (the Division) of the City's Department of Public Works, his job was to clean catch basins, which are openings in gutters where water drains from the streets into the sewer system. Cleaning catch basins involves flushing them with water pumped at high pressure through a hose attached to a truck called a "power flusher." The crew performs the following steps: (1) parking the power-flusher truck in front of the catch basin; (2) placing orange safety cones around the work area; (3) using a shovel to remove debris from the metal grate and the surrounding area; (4) washing the metal grate and

-2-

surrounding area with high-pressure water from the power flusher; (5) raising the metal grate; (6) washing dirt from the concrete frame in which the metal grate sits; (7) using the hose to remove any debris from inside the catch basin; (8) flushing the sewer line that connects the catch basin to the sewer system; (9) replacing the metal grate; and (10) placing the hose and safety cones back on the truck. Depending on the condition of the catch basin and the area surrounding it, some of these steps can be omitted.

Plaintiff's alleged misconduct began on January 31, 2000. On that morning Plaintiff and another Division employee, Nick Martinez, Jr., were unable to clean catch basins because the pump of their power-flusher truck was frozen. After discovering the problem, they went back to Division headquarters and left with a different power-flusher truck at 10:00 a.m. According to Plaintiff, he and Martinez loaded the replacement truck with water (necessary to clean catch basins) before beginning their lunch break at 11:08 a.m. The Division records indicate that they arrived at their assigned route after lunch at 12:10 p.m., although Plaintiff contends that they actually arrived at 12:05 p.m. At approximately 12:30 p.m. Plaintiff radioed the Division headquarters to report that he was having trouble with the brakes on the power-flusher truck. Plaintiff and Martinez therefore did not clean any catch basins after 12:30. Plaintiff's work ticket states that he cleaned 27 catch basins that day.

Plaintiff's immediate supervisor, Geraldine Montoya, swore in an affidavit that (1) she drove Plaintiff's route twice during the time he claims to have cleaned the catch basins; (2) she did not see him cleaning any catch basins; (3) she inspected one of the catch basins he was assigned to clean and found it covered with debris; (4) she drove by the other catch basins he was to clean, and saw none of the water marks she would have expected; and (5) when she finally saw Plaintiff and Martinez, she did not see them clean the two or three catch basins in her field of vision.

On February 15 or 16, Montoya saw Plaintiff's work ticket reporting that he had cleaned 27 catch basins on January 31. She suspected that he had not actually cleaned them, based on her January 31 observations and her belief that crews normally clean only about six or seven catch basins per hour. On February 16 Montoya informed her immediate supervisor, Jeff Snyder, of her suspicions. On that same day or the day after, Snyder and Montoya asked Plaintiff whether he had cleaned 27 catch basins on January 31. According to Snyder, Plaintiff replied that he had.

On February 17 Snyder and Operations Supervisor Don DeFiore called Martinez. Both testified that Martinez told them that he and Plaintiff had not cleaned any catch basins on January 31. In addition, DeFiore testified that

-4-

Martinez reported that he and Plaintiff had filled the truck's water tank after lunch (which would have given them even less time to clean catch basins).

On February 22 the Division served Plaintiff with a notice that it was considering disciplining him for falsely reporting that he had cleaned 27 catch basins on January 31. A pre-disciplinary meeting was held on March 3. At the meeting Plaintiff stated that he had mistakenly reported that he had cleaned 27 catch basins, when he had in fact cleaned only 17. He specified which catch basins he had cleaned. Although he admitted that he had informed Snyder and Montoya that he had cleaned all the catch basins he had reported cleaning, he explained that he had thought at that time that he had reported cleaning only 17. Plaintiff also said that he and Martinez had filled the water tank before taking their lunch break. Plaintiff offered to demonstrate that he could clean 17 catch basins in 20 or 25 minutes. According to the transcript of the meeting, when Plaintiff was asked how he could have cleaned 17 catch basins in less than half an hour when the quota for an eight-hour day is 40, Plaintiff replied, "We really fooled you." Aplt. App. at 72. Plaintiff, however, asserts in an affidavit submitted in opposition to the City's motion for summary judgment that he did not make the statement, but said something like, "Do you think we're trying to fool you?" *Id.* at 299. In addition to his own testimony, Plaintiff presented a written statement by Martinez asserting that they had cleaned 17 catch basins on

January 31, and a written statement by another employee, Christopher Gallegos, declaring that he saw Plaintiff's crew doing routine maintenance on catch basins in the assigned area on that day and saw water marks around the catch basins, indicating that they had been cleaned.

On March 16 the Division issued Plaintiff a second notice that it was considering disciplinary action against him. In addition to the charge of falsely reporting that he had cleaned 27 catch basins on January 31, the notice included a charge of inducing other employees to provide false or misleading statements in his behalf. A second pre-disciplinary meeting was held on March 23. At that meeting Plaintiff insisted that he had 20 or 25 minutes in which to clean basins. Once again, he stated that he had mistakenly reported cleaning 27, rather than 17, catch basins and he offered to prove that he could clean 17 catch basins in 20 or 25 minutes. He also mentioned that he had once cleaned 80 catch basins in a single day and had cleaned 58 in one day fairly recently. In addition, he explained that cleaning 17 catch basins in 20 or 25 minutes was not inconsistent with the number of catch basins he normally cleaned during a day (which he claimed was usually between 35 and 70), because the amount of time necessary to clean a certain number of catch basins depended on how many catch basins were in one area, and how close together they were.

Plaintiff presented at the meeting another statement by Martinez, in which Martinez claimed that his memory of the work he and Plaintiff had done on January 31 had been refreshed when he talked to Plaintiff. Addressing Martinez's changed story, Plaintiff suggested that Martinez may have acted out of spite when he initially reported that the two had not done any work on January 31, because Plaintiff had refused to provide a urine sample for Martinez's January 31 drug test. Plaintiff also provided written statements by two other employees, Steve Montes and Isaac Correa, which said that it was possible to clean 17 catch basins in 20 to 25 minutes. On the other hand, the City presented at the meeting a second statement by Gallegos, in which he stated that he had merely assumed that Plaintiff and Martinez were cleaning catch basins when he saw them in their assigned area on January 31. (Also, at his deposition in this case, Gallegos testified that the only water marks he saw were at one intersection.)

On March 24 the Division conducted a test to determine how quickly a work crew could clean the 17 catch basins Plaintiff claims to have cleaned. Beginning with a full tank of water, two selected employees cleaned the 17 catch basins in 24 minutes. In an affidavit Snyder states that when he observed the test he noticed that before the cleaning several of the catch basins contained as much as two-and-a-half inches of debris, indicating that they had not been cleaned on January 31. Furthermore, Snyder testified that the crew broke numerous traffic

laws and that he had not seen anyone clean catch basins that quickly before. Similarly, Montoya (who also observed the test) testified in her deposition that Montes (one of the men who conducted the test) "was practically running as soon as he stepped off the truck," and that "[h]e was sweating very heavily, and he was very winded." Aplt. App. at 178.

According to the affidavit of Reza Kazemian, the supervisor who ultimately terminated Plaintiff, he was informed after the timed test (although the record does not indicate the source) that "(1) Mr. Montes had broken almost every safety rule in the book; (2) Mr. Montes had worked hard and had been really sweaty; and (3) that Mr. Montes had indicated that he knew he needed to do 17 catch basins to make sure management knew Plaintiff could have done it." *Id.* at 113. Kazemian determined that "[e]ven though the test crew worked at a faster pace than management had ever seen and broke safety rules, it took them about twice as long to clean the catch basins as the 10-13 minutes management calculated that Plaintiff had available." *Id.* In his affidavit Kazemian said that he based his estimate of 10-13 minutes on his conclusion that Plaintiff and Martinez had not obtained a load of water until after lunch; he believed that they did not get water before lunch because Martinez said they did so after lunch, because the Division records showed that Plaintiff and Martinez had not done any work before lunch, and because "it would make no sense for a [Division] power flusher crew to fill

its tank with water before going to lunch because the tanks leaked so much water." *Id.* at 110. Nonetheless, concerned that the City's production quotas needed to be revised in light of the first timed test, Kazemian ordered a second timed test in which the crew would be required to abide by all safety rules.

The second test was conducted on March 27. The Division managers specifically directed the crew to clean the catch basins properly during the test. Again beginning with a full tank of water, the crew cleaned the 17 or 18 catch basins (which had been cleaned only three days earlier) in 29 minutes. Kazemian observed this test. According to Kazemian's affidavit, Montes informed him after the test that he had cleaned all 27 catch basins (when he had cleaned only 17 or 18), suggesting to Kazemian that Montes was trying to help Plaintiff.

After the second timed test, Kazemian met with Montoya, DeFiore, and Human Resource Director Kendell Hogue. All three told Kazemian that they did not believe it was possible for Plaintiff to have cleaned 17 catch basins in the time he had available, and each recommended Plaintiff's termination. In her affidavit Montoya states that her recommendation was based on her belief that Plaintiff "had lied, falsified reports, changed his story during the investigation, and induced Nick Martinez, Jr. to change his story." Aplt. App. at 60. Hogue's affidavit says that he thought termination was appropriate because he "felt that [Plaintiff] had submitted false information on his work ticket for 01-31-00

regarding the number of catch basins he submitted, that he continued to lie throughout the investigation regarding the number of catch basins the crew had cleaned, and that he had induced Nick Martinez, Jr. to lie on his behalf." *Id.* at 148. Furthermore, Snyder's final recommendation to Kazemian was that Plaintiff should be discharged, because he believed Plaintiff had falsified records and had induced Martinez to change his account of the work the two did on January 31.

Before making a decision, Kazemian reviewed the Division's records and determined that "the average number of catch basins cleaned per hour by the crews in the section of town in which Plaintiff worked is 7," and "[t]he average for power flushers throughout Denver is 5.9 catch basins . . . per hour." *Id.* at 115-116. In contrast, he calculated that "[i]f Plaintiff cleaned 17 catch basins in 20 minutes, he would be cleaning them at a rate of 51 catch basins per hour." *Id.* at 116. In his affidavit Kazemian states that he concluded, based on all the information before him—including his calculation of the average number of catch basins cleaned in an hour, Martinez's changed story, Gallegos's changed story, the results of the timed tests, Montoya's report that she had not seen Plaintiff working during the time he claims to have cleaned the catch basins or seen any sign that Plaintiff had cleaned any catch basins, and the recommendations of other supervisors—that Plaintiff had not actually cleaned the 17 catch basins. He also

believed that Plaintiff had induced Martinez to lie. For these reasons, according to Kazemian's affidavit, he decided to discharge Plaintiff.

On March 29, 2000, the City issued Plaintiff a letter (signed by Kazemian) notifying him that he was being dismissed for misconduct. The letter stated that he had "been dishonest with the Division regarding [his] work assignments," and that he had "involved other City employees in providing false information to management." *Id.* at 158-59.

On July 23, 2001, Plaintiff filed this action. The City filed a motion for summary judgment on August 8, 2002.

In ruling on the motion for summary judgment, the district court focused on whether Plaintiff had presented evidence to show that the City's purported nondiscriminatory reason for terminating Plaintiff was pretextual. Plaintiff made two arguments in support of pretext. First, he pointed to the evidence that it is possible to clean 17 catch basins in 20 or 25 minutes. The court rejected this argument, stating that "the issue is not whether it was possible for a crew to clean seventeen catch basins in twenty minutes but whether [the Division] officials reasonably believed that [Plaintiff] had not cleaned the catch basins on January 31 and had subsequently lied about the work he claimed he performed." Dist. Ct. Order at 10. Because Plaintiff had "not pointed to any evidence of record indicating that Kazemian's reliance on Montoya, Snyder, and the results of his

own investigation was improperly motivated," the district court held that the evidence that it was possible to clean the catch basins in 20 or 25 minutes did not create a genuine issue of pretext. *Id.*

Plaintiff's second argument in support of pretext was that he was treated more harshly than similarly situated non-Hispanic or younger employees. The district court rejected this argument on the ground that Plaintiff's briefing on this issue was "completely inadequate," because "[w]ith one exception, [Plaintiff] provide[d] no description of the conduct of other employees, how they were similarly situated, or what discipline was imposed." *Id.* at 10-11. In addition, the court concluded that the other employees were not similarly situated to Plaintiff. Accordingly, the district court granted the motion for summary judgment.

Plaintiff now appeals, asserting that (1) the district court erred by viewing the evidence in the light most favorable to the City and by treating disputed issues of material fact as being undisputed; (2) there exist genuine issues of material fact concerning whether pretext was established by evidence of the more lenient treatment of younger or non-Hispanic employees who engaged in misconduct of seriousness comparable to his alleged misconduct; (3) there exist genuine issues of material fact concerning whether pretext was established by evidence that he cleaned 17 catch basins on January 31; and (4) the district court improperly applied a pretext-plus test.

## II.     DISCUSSION

### A.     Standard of Review

"We review the district court's grant of summary judgment de novo, applying the same legal standard [that should have been] used by the district court." *See Simms v. Okla. ex rel Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  Because our review is de novo, we need not separately address Plaintiff's argument that the district court erred by viewing evidence in the light most favorable to the City and by treating disputed issues of fact as undisputed.  Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms*, 165 F.3d at 1326.

We analyze Plaintiff's claims under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and its progeny.  *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) ("In evaluating ADEA claims, the Tenth Circuit uses the three-stage analysis outlined in *McDonnell Douglas.*").  Under this framework the plaintiff

must initially establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of discriminatory discharge on the basis of national origin, the plaintiff must show that "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000). Similarly, to establish a prima facie case of age discrimination, the plaintiff must show that "(1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person." *McKnight v. Kimberly Clark Corp.*, 149 F.3d at 1128 (internal quotation marks omitted). If the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Because the City conceded for the purposes of its motion for summary judgment that Plaintiff could establish a prima facie case of both national-origin and age discrimination, and because Plaintiff does not argue that the City failed to

-14-

set forth adequate evidence of a legitimate, nondiscriminatory reason for the firing, we address only the issue of pretext.

## B.    Pretext

To establish pretext, Plaintiff asserts that other non-Hispanic or younger employees were treated more favorably than he when they violated work rules of comparable seriousness.  In addition, he argues that pretext is demonstrated by the weakness of the City's evidence of his misconduct.

### 1.    Unequal Treatment

#### a.    Exhibits Attached to Plaintiff's Stricken Brief

Before discussing the merits of the unequal-treatment issue, we address the City's argument that Plaintiff did not produce any admissible evidence in district court regarding the treatment of other employees.  Plaintiff's first brief in opposition to the City's motion for summary judgment contained 49 attachments, including Plaintiff's own affidavit, excerpts from Kazemian's deposition, the City's disciplinary rules, selected executive orders, and documentation of the discipline of numerous Division employees (such as letters of reprimand and notices of termination).  That brief, however, was struck by the district court for failure to comply with the court's page limitation.  Plaintiff then filed a new opposition brief.  The second brief included one attachment, labeled "Attachment 50," but Plaintiff did not reattach any of the first 49 attachments.  Because

-15-

Plaintiff's first brief had been struck, the judge apparently did not receive the first 49 attachments. The City therefore argues that the first 49 attachments are not a part of the district court record.

We agree that Plaintiff should have ensured that the 49 exhibits were available for review by the district court. Nevertheless, in the circumstances here, we reject the City's attempt to prevent us from considering evidence in those exhibits. Plaintiff's second opposition brief clearly incorporated by reference the 49 exhibits to his rejected brief. It cited to the exhibits numerous times. The City certainly could not contend that it was unaware that Plaintiff continued to rely on the exhibits attached to his first brief. Yet not only did the City fail to argue in the district court that the exhibits were not a part of the record, it actually cited repeatedly the exhibits it now claims were not part of the record. Thus, it is appropriate to consider the factual assertions in Plaintiff's amended brief that are supported by the exhibits attached to his original (rejected) brief. We will not allow the City to sandbag Plaintiff. We deny the City's motion to strike from the appellate record the attachments to Plaintiff's original district court brief, and we will permit Plaintiff to rely on contents of those exhibits that were referenced in his amended brief.

### b. Treatment of Other Employees

Plaintiff asserts that pretext is established by a comparison of his discharge with the lesser discipline imposed upon other Division employees accused of similar offenses but who were not Hispanics or were younger than he. *See Kendrick*, 220 F.3d at 1230 (plaintiff may show pretext by "providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness"). We begin by limiting the disciplinary actions available for comparison. We will not consider (1) disciplinary actions that have not been properly presented for review, (2) disciplinary actions taken by supervisors not involved in Plaintiff's termination, and (3) disciplinary actions taken in compliance with special Division rules governing alcohol and drug abuse. We explain.

First, on appeal Plaintiff uses an employee for comparison who was not used for comparison in district court argument. At oral argument before this court he devoted considerable attention to the discipline of George Justice. Yet in the district court, although Justice was mentioned in the attachments to Plaintiff's original brief in opposition to summary judgment, the brief itself made no argument involving Justice. As a result, the City would have had no reason to explain or present evidence regarding how Justice's circumstances were different from Plaintiff's. Accordingly, we will not consider on appeal whether Justice and

Plaintiff received unequal treatment. Furthermore, Plaintiff addressed several instances of discipline during oral argument that were not mentioned in his briefs on appeal. We need not consider issues raised only at oral argument. *See Federal Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998). We therefore decline to address the discipline of Marc Shockley and Patrick Villareal, or those incidents involving Milton Thalley and Ron Montaño not discussed in Plaintiff's briefs. (Plaintiff addressed some disciplinary incidents involving Thalley and Montaño in his opening brief, but then during oral argument discussed additional disciplinary incidents involving the two.)

Second, some of the employees mentioned by Plaintiff, such as Milton Thalley, were disciplined by Nick Skifalides, who was not in any way involved in Plaintiff's termination. Comparison of one disciplinary action with another ordinarily is relevant only to show the bias of the person who decided upon the disciplinary action. If X fires A, an Hispanic, for particular misconduct, but gives only a warning to B, a non-Hispanic, for identical misconduct, one might infer that something beyond the misconduct (such as a bias by X against Hispanics) motivated the disciplinary action. But if it was Y, not X, who decided not to impose a harsher sanction against B, one cannot infer that X's decision to fire A must have been motivated by something other than A's misconduct. X may simply have a less tolerant view toward misconduct than Y does. *Cf. Kendrick*,

-18-

220 F.3d at 1233 ("Different supervisors will inevitably react differently to employee insubordination."). Thus, as we have explained before, "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (internal quotation marks omitted).

Plaintiff attempts to avoid this precedent by arguing that "[t]he disciplinary actions in question were based on Division-wide policy [and] . . . disciplinary rules established by the City and County of Denver for all of its employees." Aplt. Br. at 28. When we have allowed comparisons of actions of different supervisors, however, there has been independent evidence of a specific enterprise-wide policy. *See Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1177-78 (10th Cir. 2001). Here, Plaintiff has not provided the necessary independent evidence. On the contrary, the record shows that the City's general disciplinary rules (other than those relating to drug and alcohol abuse, *see* Executive Order No. 94, Aplt. App. at 318) are broad and discretionary. *See* City Rule 16: Discipline, Aplt. App. at 302 ("The degree of discipline shall be reasonably related to the seriousness of the offense and take into consideration the employee's past record. The appointing authority or designee will impose the type and amount of discipline she/he believes is needed

to correct the situation and achieve the desired behavior or performance."). On the record before us, one could only conclude that each supervisor independently decides what the appropriate discipline should be. Comparisons of actions taken by other supervisors would have no probative value regarding the motivation for actions by a particular supervisor. Accordingly, we conclude that the general rule—that employees cannot be considered similarly situated unless they share the same supervisor—applies in this case, and we should not consider disciplinary actions taken by Skifalides.

On the other hand, we will consider discipline imposed by Snyder. Even though he did not terminate Plaintiff's employment, he was unquestionably involved in the investigation of Plaintiff's alleged misconduct, and he recommended to Kazemian that Plaintiff be dismissed. Other discipline imposed by Snyder may therefore have some bearing on the question of pretext. *Cf. Kendrick*, 220 F.3d at 1233 (same supervisor "played a role in determining the disciplinary action to be taken against [Plaintiff and the allegedly similarly situated employee,]" although the fact that they did not share the same intermediate supervisor "diminishe[d] the evidentiary value of the comparison").

Third, some of the disciplinary actions used by Plaintiff for comparison, such as discipline of Ron Montaño and Milton Thalley, were imposed for abusing alcohol or drugs. The discipline of individuals who abused alcohol or drugs was

controlled by Executive Order No 94, which set special standards (involving, among other things, rehabilitation and testing) for such infractions. Discipline under that executive order does not provide a helpful comparison to Plaintiff's case. *Cf. Aramburu*, 112 F.3d at 1404 ("Similarly situated employees are those who . . . are subject to the same standards governing performance evaluation and discipline.") (internal quotation marks omitted); *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 771 (7th Cir. 1994) ("[a]lcohol-related offenses are not the same type of misconduct as falsification of records").

After eliminating disciplinary action not presented for comparison to the district court or not raised in Plaintiff's briefs on appeal, actions by supervisors not involved in Plaintiff's discipline, and discipline for misconduct involving the abuse of drugs or alcohol, we are left with the following instances of discipline offered by Plaintiff:

**Frank Cronin:** Cronin is non-Hispanic and was born on January 22, 1956. On December 24, 1998, Kazemian suspended Cronin for three days after he verbally abused his supervisors and co-workers in a meeting. During a predisciplinary meeting Cronin apologized, admitted that his behavior was inappropriate, stated that it would not happen again, and explained that his behavior might have been triggered by the fact that his father "was on his deathbed." Cronin had previously been suspended for two days for using abusive

language, and for five days for drinking alcohol in a city vehicle. He had also received a verbal warning for making inappropriate comments during a meeting.

**Joseph Encinias:** Encinias is Hispanic and was born on October 9, 1957. On May 5, 1998, Kazemian suspended him for one day for verbally threatening another individual. Encinias's previous discipline was a letter of reprimand in February 1995.

**Robert Gallegos:** Gallegos is Hispanic, and was born on April 12, 1958. A Division investigative report dated August 6, 2001, states that Gallegos had not reported to management that another employee had asked him to provide a urine sample for that employee's drug test. (There is no indication in the record that the City ever contemplated disciplining Gallegos for failing to report the incident.) Then, three days later, Snyder signed a letter on behalf of Kazemian informing Gallegos that the Division was contemplating disciplinary action against him for taking unauthorized leave and not performing emergency duties. Gallegos resigned before any discipline was imposed.

**Bobby Russell:** Russell is non-Hispanic, and was born on February 3, 1949. On May 16, 1997, Snyder wrote Russell a counseling memorandum for making vulgar remarks about another employee. On May 15, 1998, Russell was reprimanded in a letter signed on Snyder's behalf for leaving the building shouting. On July 29, 1998, Snyder signed a letter on behalf of Kazemian

reprimanding Russell for leaving the work site without permission. On August 7, 1998, Snyder signed another letter on behalf of Kazemian, informing Russell that the Division was contemplating disciplining Russell for wearing a Division-issued shirt on which the printed words "you are not my boss" had been added. And on August 28, 1998, Kazemian sent Russell a letter informing him that he was considering disciplining Russell for making racist comments. Russell resigned before any discipline was imposed for wearing the shirt or for making the racist comments.

**Richard Snyder:** Snyder is apparently non-Hispanic. On June 25, 1998, when Snyder was nearly 46 years old, Kazemian reprimanded him for engaging in a verbal confrontation with a co-employee. On September 1, 1998, Kazemian discharged Snyder for sexually harassing another employee.

None of these disciplinary actions created a genuine issue regarding pretext, because no reasonable factfinder could view any of them as supporting Plaintiff's pretext claim. The incident resulting in Richard Snyder's discharge is of no assistance to Plaintiff because the discipline was as severe as what he suffered. And the incidents leading to the resignations of Russell and Gallegos are irrelevant because no decision had been made regarding what discipline should be imposed. As for the other misconduct by Cronin, Encinias, Russell, and Snyder, the misconduct could reasonably be viewed as less serious than the

dishonesty displayed by Plaintiff. *See Elmore v. Capstan, Inc.,* 58 F.3d 525, 530 (10th Cir. 1995) (violations must be of comparable seriousness); *Williams v. Penske Transp. Servs., Inc.*, 46 F. Supp. 2d 1135, 1142 (D. Kan. 1999) ("an employer may reasonably prioritize trustworthiness over other nondiscriminatory characteristics in determining whether to discharge an employee for misconduct"); *see also Kendrick*, 220 F.3d at 1233 (employees were not similarly situated, in part because one, unlike the other, "did not justify his conduct or otherwise make any conciliatory gestures").

Accordingly, we agree with the district court that Plaintiff cannot escape summary judgment by relying on this evidence of discipline of fellow workers.

### 2. Weakness of the City's Evidence of Misconduct

Plaintiff asserts that

> there exist genuine issues of material fact as to whether [he] cleaned 17 catch basins on January 31, 2000; whether he had lied or merely made an innocent mistake in stating initially on his work order that he had cleaned 27 catch basins that day; whether he had lied in denying that he had cleaned 17 catch basins; whether he had asked or induced Mr. Martinez or Mr. Gallegos to lie for him; and whether it was possible for him to have cleaned 17 catch basins during the time available to him that day.

Aplt. Br. at 21. The City responds that Plaintiff "must show that there is a dispute or genuine issue concerning the sincerity of the City's proffered reason for his termination, and not simply that the decision was, in retrospect, erroneous

-24-

or ill-advised." Aplee. Br. at 16. We agree. We further agree with the City that Plaintiff has not made the requisite showing.

"The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision." *Watts v. Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001) (internal quotation marks omitted). "An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment." *McKnight*, 149 F.3d at 1129; *see also Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1268-69 (10th Cir. 2004) (employer's good faith belief "would not be pretextual even if the belief was later found to be erroneous") (internal quotation marks omitted).

Nevertheless, "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323

-25-

(10th Cir. 1997) (internal quotation marks omitted). Thus, Plaintiff could show pretext by persuading the jury that the evidence of Plaintiff's misconduct presented to Kazemian was so implausible, incoherent, or internally contradictory that Kazemian must have made his decision on some other basis. In our view, no reasonable jury could be so persuaded by the evidence in this record.

The implausibility lies in Plaintiff's version of events, not Kazemian's. To have any chance of cleaning 17 catch basins in the available time, Plaintiff must have decided to take a lunch break promptly after filling the tank with water (even though leakage would result in a substantial loss of water), and then proceeded promptly after lunch to work at a breakneck pace to clean as many basins as possible, despite there being no apparent reason for the rush (he could hardly have anticipated the brake failure that would occur at 12:30). In addition, to believe Plaintiff, Kazemian would have had to disbelieve Montoya's report of her observations and believe Martinez's retractions of his original statement that he and Plaintiff had filled the water tank after lunch and cleaned no basins on January 31.

Perhaps a reasonable factfinder could observe all the witnesses and believe Plaintiff's version of the events of January 31. As previously noted, however, that is not the issue. *See Bullington*, 186 F.3d at 1318. What is at issue is whether the evidence of Plaintiff's misconduct presented to Kazemian was so

weak that a rational factfinder could infer that Kazemian's expressed reason for terminating Plaintiff must have been pretextual. We think not. In other words, Plaintiff's evidence regarding the events of January 31 failed to raise a genuine issue regarding pretext.

Having rejected both of Plaintiff's arguments regarding pretext, we hold that he has failed to establish a genuine issue of material fact as to whether the City's proffered reason for terminating his employment was pretextual.

## C.    Pretext-Plus

Finally, we reject Plaintiff's argument that the district court applied a "pretext-plus" standard in this case. Plaintiff contends that the district court improperly required him to rebut the City's motion for summary judgment by producing both direct evidence that the City was motivated by an illegal discriminatory animus and evidence showing that the City's proffered reasons for terminating his employment were pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) ("because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination").

Plaintiff rests his claim of error on the following statement made by the district court: "Although certainly Rivera had produced evidence to Kazemian

that his work was possible, he has not pointed to any evidence of record indicating that Kazemian's reliance on Montoya, Snyder, and the results of his own investigation was improperly motivated." Dist. Ct. Order at 10. Unlike Plaintiff, we view this statement as simply conveying that Plaintiff had produced some evidence that he had actually done the work, but had not presented evidence calling Kazemian's good-faith belief into question. Significantly, the quoted statement concludes the district court's discussion of whether there was a genuine issue of material fact as to whether Kazemian believed in good faith that Plaintiff had not done the work and had induced others to lie. We read the district court's opinion as expressing only that Plaintiff had failed to establish pretext in the first place. We do not agree with Plaintiff that the court found an adequate showing of pretext but required additional evidence.

## III. CONCLUSION

We AFFIRM the district court's summary judgment in favor of the City.