FILED
United States Court of Appeals
Tenth Circuit

**January 9, 2009**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GENE BITTEL,

      Plaintiff - Appellant,

      v.

PFIZER, INC.,

      Defendant - Appellee.

No. 07-3311

(D. Kansas)

(D.C. No. 6:06-CV-01195-JTM)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, Circuit Judge, **BRORBY,** Senior Circuit Judge, and **HARTZ**, Circuit Judge.

Plaintiff-Appellant Gene Bittel was terminated from his employment with Defendant-Appellee Pfizer, Inc. ("Pfizer") in June 2005. Bittel alleges he was terminated because of his age in violation of the Age Discrimination in Employment Act ("ADEA") and various Kansas employment discrimination statutes. Pfizer contends it terminated Bittel because of multiple violations of corporate policy which called his integrity into question and placed Pfizer at risk

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of violating FDA regulations and Pharmaceutical Research and Manufacturers of America ("PhRMA") guidelines. While Bittel acknowledges he violated some company policies, he claims the policy violations were pretextual and he was actually terminated because of his age. In support, Bittel argues the following: the company gave varying explanations of his policy violations and the reasons for his termination; some of the allegations against him were exaggerated, untrue, or based on nonexistent policies; his younger supervisor's conduct demonstrated age-based animus towards Bittel; and Pfizer's regional workforce as a whole was getting younger when he was terminated. The district court granted summary judgment in favor of Pfizer, concluding Bittel had not created a genuine issue of material fact as to pretext. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the district court. The evidence, viewed in the light most favorable to Bittel, only casts doubt on some of the purported policy violations cited by Pfizer and does not create a genuine issue of material fact as to pretext.

## I. Background[1]

---

[1]The pertinent facts to this appeal are all taken from the Appendix filed by Appellant Bittel, which contains the entirety of the record before the district court when it ruled on the motion for summary judgment. Pfizer filed a Supplemental Appendix with additional evidence that was not before the district court in order to "correct and clarify factual misstatements" in Bittel's opening brief. Because summary judgment is proper in the absence of the additional evidence in the Supplemental Appendix, Bittel's motion to strike the Supplemental Appendix is **granted** and the Supplemental Appendix is hereby stricken from the record.

Bittel was born in 1955. He became a pharmaceutical sales representative in 2001 with Pharmacia, Inc., and became a Pfizer employee in 2003 when Pfizer acquired Pharmacia. His territory covered the northwestern third of Kansas. For most of Bittel's tenure at Pfizer, his supervisor was Bill Giltner. Giltner is twelve years younger than Bittel. Bittel was the oldest sales representative on his sales team.

In April 2004, Bittel received a regional sales award. Around the same time, however, Giltner and Giltner's supervisor, Kevin Malone, placed Bittel on an immediate action plan, a remedial plan to correct perceived deficiencies in Bittel's selling ability. According to Bittel, Giltner was a demanding and abrasive supervisor. In June 2004, Bittel claims Giltner told him he did not deserve the sales award he had won. Giltner also allegedly told Bittel that Bittel "had no respect for [Giltner] because [Bittel] was so much older than he." Shortly thereafter, Bittel was placed on a more drastic probationary plan, a performance improvement plan, due to perceived sales deficiencies. Bittel claims these probationary measures were imposed despite his achievement of nearly 100% of his sales goals for the year 2004. At the end of the year, Bittel was taken off formal probationary status, but Giltner indicated Bittel should take part in various organized promotional activities. Giltner also took extensive notes regarding Bittel's job performance and perceived deficiencies, including such things as his dress and language at company meetings. Giltner took more notes

on Bittel than he did on any other employee, although he took notes on thirty to forty percent of his employees. Bittel testified Giltner's managerial style drove another employee to quit. A coworker testified Giltner was demanding of everybody.

Bittel claims he was required to host a teleconference for health care practitioners in early 2005. He made arrangements to co-host a teleconference with another representative, but was told by Giltner he would not be considered the "host." On short notice, Bittel arranged a separate teleconference, but on the day of the teleconference he learned the facility he had reserved lacked a telephone line. Improvising, he instead passed out printed copies of slides which would have been presented had the teleconference taken place and asked the doctors to listen to the teleconference on their own time. Pfizer claims this was a violation of the company's policies, which closely regulate the form and content of information disseminated to health care practitioners.[2]

This violation was reported to Giltner by another sales representative who had been present at the meeting. Without mentioning the violation, Giltner later emailed all of the sales representatives and requested a list of the teleconferences they had hosted so he could award them points as part of a bonus program called ACE. Bittel responded and claimed credit for the botched teleconference. Giltner

[2] If the information is not accurate or even-handed for example, Pfizer could violate FDA regulations and PhRMA guidelines.

awarded Bittel the ACE points even though he had already been informed that the teleconference had violated company policy.

Concerned about the teleconference and other perceived violations of company policy, Giltner and Malone arranged a meeting with Bittel. Bittel claims he was not told the purpose of the meeting. Bittel also claims Giltner told him he did not plan on attending the meeting. When Bittel arrived, however, Giltner was present. Bittel says this caused him to lose his composure. Bittel was questioned about the teleconference and told several different versions of what went on before telling the truth. During the meeting, Bittel also admitted to copying the teleconference onto a personal CD, which he was told was a violation of Pfizer policy. At the end of the meeting, he claims he was never given a warning or told he was no longer in good standing. After the meeting Malone recommended firing Bittel and drafted a "final warning letter," but the letter was never sent to Bittel. The following day, Giltner called Bittel on two separate occasions. First, Giltner told Bittel he would not receive a merit pay increase based upon his 2004 sales. Second, Giltner told Bittel his expense report was overdue. Bittel believes the calls were timed to harass him.

Just over a week after the meeting, Bittel organized, with two other sales representatives, a "journal club," an informal periodic meeting where medical practitioners present recent medical developments to each other. Pharmaceutical representatives sometimes sponsor these gatherings, and Pfizer policy allows for

the payment of honoraria to the speakers as long as the audience includes practitioners who are not co-workers of the speaker. Audience members are not entitled to payment. For this event, the sales representatives invited practitioners from multiple clinics, but the only ones who actually attended were co-workers of the speaker. The representatives paid the speaker anyway, and also paid the audience members. Bittel informed Giltner of the event after it had taken place. Giltner reported the incident to Pfizer's corporate compliance attorneys, but they recommended no discipline of the participating representatives because the policy had evidently generated confusion. The other sales representatives who put on the event were younger than Bittel.

Another Pfizer promotional activity is the awarding of grants for educational events, including continuing medical education seminars. The sales representatives complete grant applications and the applications are submitted to Pfizer for approval. The approval process takes some time, and Bittel claims doctors are not always able to clear their schedules far enough in advance to allow Pfizer to process the grant applications before the event takes place. One solution to this problem is to place a false date on the grant application—if the event is really going to take place in two weeks, the representative indicates it will take place in four weeks in order to allow sufficient time for approval.

Bittel claims forward-dating was common practice, although after he was terminated he admitted it was a violation of PhRMA guidelines. Pfizer points out

Bittel was unable to provide the name of a single other representative who engaged in forward-dating. Alison Combs, who worked at a foundation which requested grants from Pfizer, told Bittel she had forward-dated grant applications for other sales representatives, but she could not remember who they were. Bittel also presented e-mails he sent to Giltner which Bittel claims prove Giltner was aware of forward-dating. The e-mails show that Giltner approved a grant application for an event with one date, and then approved an agenda for the event which indicated it would take place on an earlier date.

In May 2005, Bittel informed Giltner he had submitted a forward-dated grant application and wanted to know if forward-dating was still permitted. Giltner directed Bittel to contact the person who handled grant applications. He did so, and was told he would be contacted if there was a problem resolving the issue. He never heard anything else regarding the matter. In fact, the matter had been referred to Pfizer's attorneys for review.

On June 30, 2005, Bittel was terminated. A successor was not immediately hired because a hiring freeze was in effect, but five co-workers, all of whom were younger than Bittel, picked up Bittel's workload. Another sales representative significantly younger than Bittel was hired in October of 2005 and served Bittel's former territory.

In the sixteen-month period following Bittel's termination, Pfizer hired or re-hired twenty new sales representatives in Kansas, only two of whom were over

the age of forty. By contrast, it terminated nineteen people over the same period, five of whom were over the age of forty. Over a longer period from January 1, 2004, through September 2006, eleven of thirty-one terminations were people over the age of forty, with two additional thirty-nine year-olds fired during that period.

Following his termination, Bittel brought suit in the United States District Court for the District of Kansas against Pfizer pursuant to the ADEA, 29 U.S.C. §§ 621-634, the Kansas Acts Against Discrimination, Kan. Stat. Ann. §§ 44-1001 to -1044, and the Kansas Age Discrimination in Employment Act, Kan. Stat. Ann. §§ 44-1111 to -1121. Pfizer moved for summary judgment on all three statutory claims. Analyzing the ADEA claim and the state law claims in the same manner,[3] the district court granted the motion for summary judgment. The district court concluded Bittel had made out a prima facie case of age discrimination but had failed to prove, under the *McDonnell Douglas* burden-shifting framework, Pfizer's proffered reasons for termination were pretextual. Bittel appeals this ruling.

## II. Discussion

---

[3]Kansas courts look to federal standards in evaluating state law employment discrimination claims. *Rebarchek v. Farmers Coop. Elevator*, 35 P.3d 892, 898 (Kan. 2001); *Beech Aircraft Corp. v. Kan. Human Rights Comm'n*, 864 P.2d 1148, 1151-53 (Kan. 1993).

This court reviews the district court's grant of summary judgment de novo, applying the same standard applied by the district court. *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1104 (10th Cir. 2008). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, this court views the evidence and draws reasonable inferences in the light most favorable to the nonmoving party. *Sanders*, 544 F.3d at 1105.

The ADEA protects employees over the age of forty from being discharged or otherwise subject to discrimination because of their age. 29 U.S.C. §§ 623(a)(1), 631(a). The employee's age must be a determining factor in the employer's decision. *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996). In certain cases, such as when written policies are being challenged, plaintiffs can prove age discrimination directly. *Sanders*, 544 F.3d at 1105. In other instances, plaintiffs must rely upon indirect or circumstantial evidence of discrimination. *Id.* Such claims of indirect discrimination are evaluated under the *McDonnell Douglas* burden-shifting framework. *Id.; see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under the *McDonnell Douglas* framework, a plaintiff must initially make out a prima facie case of employment discrimination. *Hinds v. Spring/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008). If the plaintiff presents a prima facie case, the employer then has the burden of showing a legitimate, non-discriminatory reason for the

adverse employment action. *Id.* If the employer makes this showing, the burden shifts to the plaintiff to prove the proffered justification was pretextual. *Id.* Here, Bittel acknowledges he has only indirect evidence of discrimination, and therefore the *McDonnell Douglas* analysis applies.

### A. Prima Facie Case

The initial burden of proving a prima facie case under *McDonnell Douglas* is not onerous. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Additionally, due to the wide range of forms discrimination can take in the employment context, the precise elements of a prima facie case vary from one setting to the next. *Id.* at 253 n.6. In this case, the parties agree the proper elements of a prima facie case are: (1) the plaintiff was a member of the protected age group at the time of discharge, (2) the plaintiff was doing satisfactory work, (3) the plaintiff was discharged, and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. *See Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

Bittel satisfies the first and third elements of the prima facie case, since his age and the nature of the employment action are not at issue. Pfizer also concedes that Bittel meets his prima facie burden for the second element with his own declaration that his work was satisfactory. The only remaining issue, therefore, is whether Bittel has met the fourth element. Pfizer argues Bittel has failed to prove this element because the only evidence he has to support a claim

of discrimination are the events leading up to his termination, a "stray remark," and the more favorable treatment of non-similarly situated employees.

A plaintiff can prove the fourth prong of the prima facie case by showing, inter alia, "preferential treatment given to employees outside the protected class." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quotation omitted). Bittel has presented evidence sufficient to meet his burden at the prima facie stage. Without considering the proffered reasons for Bittel's discharge, and considering the evidence in the light most favorable to Bittel, he was treated more harshly than younger sales representatives for what appeared to him to be similar policy violations. Additionally, after Bittel was terminated, his job duties were assumed by younger employees. These facts are enough for Bittel to present a prima facie case of age discrimination.

Pfizer has proffered a nondiscriminatory reason for terminating Bittel: it claims his repeated policy violations called his integrity into question and placed Pfizer at risk. Bittel concedes this is sufficient to meet Pfizer's burden at the second stage. At the third stage of the *McDonnell Douglas* analysis, Bittel must present evidence to raise a genuine issue as to whether this proffered reason was pretext for age discrimination. *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008). Bittel may prove pretext by presenting evidence showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" that a jury could infer the employer

actually acted out of a discriminatory motive. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005) (quotation omitted). To determine whether the plaintiff's burden has been met, this court must consider all of the plaintiff's evidence as a whole. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004).

Bittel presents several reasons why Pfizer's proffered reason was pretext for age discrimination. First, Bittel contends Pfizer's explanations of his policy violations and its stated reasons for his termination have been inconsistent, and, moreover, its use of subjective criteria suggests pretext. Second, he argues Pfizer has exaggerated or fabricated policy violations. Third, he contends his supervisor's pattern of treatment suggests age animus. Fourth, he presents statistical data regarding the ages of individuals hired and fired by Pfizer in Kansas, which he claims indicate age bias.

1.    Inconsistent Explanation of Policy Violations and Reasons for Termination.

Bittel's first contention is Pfizer's explanations of his policy violations and stated reasons for termination have shifted over time. This, he argues, demonstrates Pfizer's stated rationale for terminating him was pretextual. *Bryant*, 432 F.3d at 1125. To show the explanations of the policy violations shifted over time, Bittel points to statements by Pfizer personnel that he was not disciplined for any of the policy violations cited as grounds for his termination. Bittel also

points to a supposed inconsistency in the testimony of Malone, the regional manager, regarding the reason for his termination. At one point, Malone testified Bittel was discharged because the totality of his policy violations created an integrity issue. At another point Malone testified Bittel was terminated because of the journal club and forward-dating incidents. Moreover, Bittel argues, integrity is a subjective criterion for evaluating employees, and the use of subjective criteria can be evidence of pretext. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002). Finally, Bittel argues other employees were not disciplined for the same or similar conduct.

As for the statements of Pfizer personnel that Bittel was not disciplined for any of his individual policy violations, this is not strong evidence of pretext. Regardless of the form of discipline taken for each violation, the evidence shows each was treated as a potential policy violation when it occurred. After the teleconference incident Bittel was summoned to a meeting in Denver, interrogated about the incident, and told he had violated company policy. Similarly, the journal club and forward-dating incidents were referred to Pfizer's attorneys shortly after they took place, indicating those events were treated as policy violations when they occurred.

Malone's testimony was not internally inconsistent regarding why Bittel was terminated. Malone testified the journal club incident and the forward-dating incident were the two offenses precipitating Pfizer's decision to terminate Bittel's

-13-

employment after Pfizer had developed concerns about Bittel's integrity due to the teleconference incident. This testimony is wholly consistent with Malone's statement that Bittel was terminated because all of his policy violations suggested he had integrity issues that could put Pfizer at risk. Furthermore, in this context, Pfizer's integrity determination was premised wholly upon Bittel's misrepresentations to Pfizer and his violation of objective corporate policies. Therefore, Pfizer did not rely upon subjective criteria in deciding to terminate Bittel and its integrity explanation is not probative of pretext.

Bittel's evidence regarding disparate treatment also fails to demonstrate pretext. As for the teleconference incident, Bittel was the instigator of the event. He alone distributed unapproved materials, improperly requested ACE reward points, and lied about the incident to his supervisors. He therefore was not similarly situated to the other employees involved in the incident. *Rivera v. City & County of Denver*, 365 F.3d 912, 924 (10th Cir. 2004) (holding that employers may view dishonesty as more serious than other policy violations). As for the journal club incident, even assuming he was similarly situated to the other employees involved, the evidence established that all of the employees were treated similarly following the incident since none of the employees were disciplined. Regarding the forward-dated grant application, Bittel was unable to discover a single other employee who had forward-dated a grant application, so he could not present evidence that he was treated more harshly than similarly

-14-

situated employees for that supposed violation. In summary, Bittel did not show he was treated differently than other employees for similar actions, either because the actions he engaged in were qualitatively different or because he simply lacks evidence of disparate treatment.

2. Exaggerated or Falsified Policy Violations.

Bittel also argues Pfizer has exaggerated or falsified his supposed policy violations. He attacks, in various ways, the journal club speaker fee policy, the policy prohibiting sales representatives from using homemade promotional materials (the "anti-homemades policy"), and the policy prohibiting forward-dated grant applications. He argues the policies currently cited by Pfizer were either nonexistent or ambiguous at the time he supposedly violated them, demonstrating pretext.

As to the journal club policy and the anti-homemades policy, Bittel argues they were confusing. He claims the journal club policy was unclear as to whether speaker fees were permitted when medical personnel were invited from different clinics but the only actual attendees were members of the speaker's clinic. For the anti-homemades policy, Bittel argues the written policy did not explicitly prevent the electronic duplication of approved promotional materials. Interpreting the evidence in the light most favorable to Bittel, we can assume for the purposes of summary judgment that these policies were ambiguous to sales representatives in Bittel's position. Bittel's interpretation of company policy,

however, is irrelevant. Instead, the proper inquiry is whether Pfizer honestly believed Bittel had violated its policy and acted in good faith upon that belief. *See Rivera*, 365 F.3d at 924-25 (explaining that the relevant inquiry is whether an employer acted in good faith upon honestly held beliefs). Bittel has not presented any evidence to demonstrate Pfizer did not actually believe he had violated these policies. Therefore, any ambiguity is not probative of pretext.

Next, Bittel claims the forward-dating policy was selectively enforced. While Bittel acknowledges forward-dating of grant applications violates PhRMA guidelines, he claims forward-dating was common practice because it was often difficult to line up speakers far enough in advance to meet the grant approval time frame. Interpreting the evidence in the light most favorable to Bittel, we will assume sales representatives had previously forward-dated grant applications with Giltner's knowledge and tacit approval.

If falsifying the date of the grant application were the sole reason for Bittel's termination, then the inconsistency in applying the policy might create a genuine issue as to pretext. *See Spulak v. K Mart Corp.*, 894 F.2d 1150, 1155 (10th Cir. 1990). As the facts stand, however, this violation came shortly after a string of other policy violations, including the improper distribution of slides at the teleconference, the untruthful statements about what went on during the teleconference, the duplication of the CD, the request for ACE reward points, and the payments to the speaker and participants at the journal club. Even if a

-16-

plaintiff casts doubt on one of an employer's proffered explanations for the discharge, an employer is still entitled to summary judgment unless the plaintiff "casts substantial doubt on many of the employer's multiple reasons [such that] the jury could reasonably find the employer lacks credibility." *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000). Bittel has, at best, cast doubt on whether he was treated consistently as to the forward-dating incident, but he has not proven this justification was so false as to cast doubt on Pfizer's credibility. This evidence thus does not raise a genuine issue as to pretext regarding the remaining policy violations.

3.      Giltner's Animus Towards Bittel.

Bittel also presented evidence regarding negative treatment by Giltner, his supervisor. Bittel claims this treatment was so antagonistic it suggested impermissible animus on Giltner's part. Because Giltner was his supervisor and involved in the decision-making process regarding his termination, Bittel argues Giltner's animosity is evidence of discrimination on the part of Pfizer.

Bittel offers several examples of Giltner's animosity. The first example, and in Bittel's view the most significant, is Giltner's remark that he believed Bittel did not respect him because of his age. In order to establish pretext, Bittel must show a nexus between the comment and the adverse employment action. *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("Isolated

-17-

comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions."). The comment by Giltner was not a "stray remark" because it was directed towards Bittel and was made by an individual involved in determining Bittel's employment status. *See Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir. 1996). However, the comment was made over a year before Bittel was terminated. Between the comment and the termination, Bittel was placed on, and removed from, a performance improvement plan, and Bittel also committed all of the policy violations cited by Pfizer as grounds for his termination. Under these circumstances, the comment is simply too far attenuated from Bittel's termination to be probative of Pfizer's motivation. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (holding that racial remark made by one person involved in termination decision ten months before termination was too remote to support a finding of pretext).

Bittel argues there was other evidence of Giltner's animus. Bittel points to evidence that Giltner took extensive notes on him and berated, harassed, and humiliated him. Shortly after Bittel won his sales award, Giltner put him on an immediate action plan and later a performance improvement plan, which Bittel believes was an effort to force him out of the company. After Bittel was removed from his performance improvement plan due to improved sales figures, Bittel contends Giltner tried to force him out of the company by setting him up to

-18-

commit the policy violations. Specifically, Bittel argues Giltner pressured him into setting up the teleconference on short notice, solicited Bittel's ACE points request without telling Bittel he knew the teleconference had not occurred as planned, ambushed Bittel at the post-teleconference meeting with Malone, forced Bittel to put on a journal club, and did not inform Bittel he had violated Pfizer policy by forward-dating the grant application. Taken together, Bittel contends these actions constituted a concerted effort by Giltner to engineer Bittel's termination and replacement with a younger, more submissive employee.

Although Giltner took more notes on Bittel than he did on anyone else, he took notes on thirty to forty percent of his team, and Bittel did not present evidence that older employees were singled out for note-taking. On the contrary, the evidence suggests Giltner was tough on all of his employees. While Bittel argues his placement on a performance improvement plan is evidence of pretext, at least one other individual under the age of forty was placed on a performance improvement plan despite sales numbers as high as Bittel's. The probative value of Bittel's placement on a performance improvement plan is also significantly diluted by his subsequent removal from it. In summary, Bittel has scant evidence that Giltner's negativity towards him was motivated by age bias, and even less evidence that this bias was the reason for his termination. *See Honce v. Vigil*, 1 F.3d 1085, 1089 n.1 (10th Cir. 1993) (stating tenant could not prove disparate

treatment based upon sex when landlord was "equally nasty" to all tenants and evicted tenants of both sexes).

Bittel's theory about Giltner masterminding his termination by setting him up for failure is sheer speculation. Bittel has failed to show Giltner made any special demands upon him. The events Bittel was "forced" to host, namely the teleconference and the journal club, were events that all sales representatives under Giltner were expected to organize. Gilter asked all of his employees to submit requests for ACE points. Assuming Giltner misled Bittel about his presence at the meeting following the teleconference incident, it would be pure conjecture to conclude Giltner did so with the intent to surprise Bittel into lying about his activities. Bittel has not presented sufficient evidence to permit this court to infer the existence of a concerted plan to induce Bittel's policy violations.

4.     Statistical Evidence.

Bittel cites statistics regarding the ages of individuals who are hired and fired at Pfizer and claims they demonstrate age bias. While this statistical evidence may not be sufficient to raise an issue as to pretext when considered in isolation, Bittel claims it should be viewed in conjunction with the rest of the evidence as probative of pretext. In order to be probative of discrimination, statistical evidence must "eliminate nondiscriminatory explanations for the disparity." *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991).

-20-

Bittel's statistics show that older workers were terminated at a greater rate than they were hired, and younger workers were hired at a greater rate than they were terminated. These statistics, however, do not show disparate treatment of older workers because they control for neither the ages of applicants who were not hired nor the ages of employees who were not terminated. If more young people are applying for jobs, for example, Pfizer would probably hire them in greater proportion than older people. Likewise, if Pfizer's existing workforce is skewed towards older workers, it would be unsurprising for more older employees to be terminated. These are nondiscriminatory explanations for the statistical variations that must be eliminated if the statistics are to be probative of discrimination. *Id.* at 746-47. Because Bittel did not rule out these possible explanations for the hiring and termination rates, his statistical data are not probative of pretext.

5.      Considering the Evidence as a Whole.

To survive summary judgment, Bittel need not raise a genuine issue as to pretext with any individual piece of evidence. Rather, his claim survives if all of his evidence, taken together, creates a genuine issue as to pretext. *Annett*, 371 F.3d at 1241. A great deal of the evidence Bittel presented, however, is not probative of pretext. The only evidence that is probative of pretext is: the ambiguity of the speaker fee and homemades policies, the past practice of forward-dating grant applications, and Giltner misleading Bittel on several

occasions. None of this evidence exculpates Bittel's violation of the teleconference policy, his untrue statements when asked about the teleconference, his improper request for ACE points, or his improper payments to non-speakers at the journal club. Bittel was terminated shortly after he violated a series of Pfizer policies, some of which Pfizer claims could have exposed it to serious liability for violating federal regulations or PhRMA guidelines. A rational factfinder could come to only one conclusion regarding Bittel's termination: he was terminated because of this spate of policy violations, not his age. Because Bittel did not raise a genuine issue of material fact as to pretext and Pfizer was entitled to judgment as a matter of law, the district court was correct in granting summary judgment in favor of Pfizer.

### III. Conclusion

For the foregoing reasons, Pfizer is entitled to summary judgment and the judgment of the district court is therefore **AFFIRMED**.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge