**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BARBARA BERRY,

      Plaintiff - Appellant,

v.

      No. 05-1533

T-MOBILE USA, INC.,

      Defendant - Appellee.

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 04-cv-1494-LTB-CBS)**

Andrew T. Brake of Andrew T. Brake, P.C., Englewood, Colorado, (Lee T. Judd of Andrew T. Brake P.C. and Thomas H. Terry of The Law Office of Stephen H. Swift, P.C., Colorado Springs, Colorado, with him on the briefs) for Plaintiff - Appellant.

David R. Hammond (Sue A. Haskell, with him on the briefs) of Davis Graham & Stubbs LLP, Denver, Colorado, for Defendant - Appellee.

Before **LUCERO, SEYMOUR** and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

After T-Mobile USA, Inc. (T-Mobile) terminated Barbara Berry's employment, she filed an action claiming the termination violated the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, Title VII of the Civil Rights Act (sex discrimination), 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621. She also alleged breach of implied contract and promissory estoppel. The district court granted summary judgment in favor of T-Mobile concluding Berry was an "at-will" employee. The court also determined: (1) Berry was not "disabled" under the ADA because she had not shown her disability severely impacted a major life activity, and (2) she failed to establish pretext in relation to her gender and age discrimination claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## Background

Berry began as an employee with T-Mobile's predecessor, VoiceStream, in October 2000, working in the Colorado Springs, Colorado, office as a Customer Care Supervisor for an annual salary of $37,000. She was hired just before her 51st birthday. She received an employee handbook and signed the page which stated: "I understand that my employment is at will to the fullest extent allowed by law and is entered into voluntarily and may be terminated by me or the Company at any time, with or without cause or notice." (Appellant's App. Vol. I at 201.) In addition, page three of the handbook contained a paragraph which reiterated her at-will status. It provided in relevant part:

-2-

> Nothing contained in this Agreement shall alter the status of Employee's employment with Employer, which is "at will." Employee acknowledges and understands that Employee's employment is of no specific duration and can be terminated at any time by either Employee or Employer with or without cause, for any reason or no reason, at any time. Employee acknowledges and agrees that any representations to the contrary are unauthorized and void, unless contained in a formal written employment contract signed by both an Executive Officer of Employer and Employee.

(*Id*. at 202.)

On January 30, 2002, Berry accepted a promotion to Customer Care Team Manager at an annual salary of $42,500 with a possible 10% bonus.[1] As a team manager, Berry supervised six team coaches. Each team coach led a team of twelve to fifteen customer care representatives who received and handled calls from customers seeking assistance with their telephone services. Shortly after her promotion, she received a favorable final performance review for her former position.

Later that year, VoiceStream became T-Mobile. The new general manager of the Colorado Springs care center, Kevin Kavanah, assumed his duties in December 2002. He was charged with evaluating the senior leadership team to improve the call center's poor performance. As part of the shift in management, T-Mobile made clear it valued teamwork and expected its team managers to practice various strategies to promote this overall vision.

---

[1] The offer of promotion included a paragraph stating her at-will status would continue.

In 2003, in addition to her salary and bonus, Berry was identified as a "key employee" and was invited to participate in a T-Mobile Cash Incentive Plan.[2] (*Id*. at 225.) In September 2003, she received a raise based upon market and job performance. However, Berry had difficulty with T-Mobile's requirement that she use the proper coaching methods to improve her teams' performance. The endorsed methods included "employing a positive personal style, forming a detailed plan and strategy for improving the performance of teams and individuals, establishing timelines, reviewing progress, and [] holding others accountable for implementing the plan." (*Id*. at 132.) According to T-Mobile, Barry did not employ the proper coaching methods, hold her team members accountable, or interact well with the other managers. At one point she allegedly made a "verbal attack" on Stephanie Brickel, the training manager. Kavanah repeatedly counseled Berry on this aspect of her performance.

In late October or early November 2003, William Grier was promoted to

---

[2] The Plan itself contained a paragraph entitled Employment at Will which provided:

> Nothing in this Plan shall be construed in any way to alter the fact that the participant is an employee at will and that either the participant or the Company can terminate the employment relationship at any time, with or without reason.

(Appellant's App. Vol. I at 227.)

senior manager, supervising the team managers and reporting to Kavanah.[3] After Grier became senior manager, Berry reported to him. On October 30, 2003, Berry approached Kavanah to discuss her "not feeling valued as a [team manager]" and "she fe[lt] any day she may be terminated." (*Id*. at 193.) Kavanah, having become aware of a recent "breakthrough" in Berry's coaching and reports of her improvements, assured her things were fine and she had nothing to worry about. (*Id*. at 150-51.) He also called her that day to repeat his assurances. He documented the conversation in a memorandum stating her teamwork had obviously improved, she was valued highly, and "she would clearly know if her job was in jeopardy, and that any leader would know that before the ultimate in disciplinary action takes place." (*Id*. at 193.)

T-Mobile contends that Kavanah's belief Berry had made a breakthrough was based on one successful coaching session in late summer 2003. Unfortunately, his belief was short-lived. Kavanah later sat in on a meeting in which Berry did not coach well and two weeks later reminded her she needed improvement. Shortly before being fired, she prepared an unsatisfactory action plan to address specific needs for her teams and coaches to improve. At the same time, Grier reported to Kavanah that Berry again was failing to hold her teams

---

[3] Prior to Grier's promotion, Randy Smith had been promoted from team manager to senior manager. Although Smith had done excellent work as a team manager, he was not successful in the senior manager position. Eventually Smith was demoted back to his old position. During the period between Smith's demotion and Grier's promotion, Berry reported directly to Kavanah.

accountable and refusing to work as a team member with her peers.

In October or November of 2003, Berry spoke with Kavanah about needing a rest at work due to extreme fatigue caused by multiple sclerosis (MS). Berry had been diagnosed with MS twelve years earlier and Kavanah was aware she was receiving treatment for her condition. Her primary treating physician was Dr. Elliott Frohman located in Dallas, Texas, whom she saw annually. Kavanah responded she would need to apply for leave under the Family Medical Leave Act (FMLA) in order to take time off. She filed her application, which was granted the day before T-Mobile terminated her employment.

According to T-Mobile, the decision to terminate Berry's employment had already been made when she made her request for FMLA leave. Kavanah had been engaged in discussions with the human resources manager, Cassandra Shepard, regarding the call center's poor performance. Some time in November the discussions culminated in a decision in which Kavanah, after consulting with Kavanah's supervisor, Shepard, Shepard's supervisor and Grier, decided to terminate the three female team managers Berry, Bannister and Olson, and a team coach, David McMilleon.

T-Mobile terminated Berry's employment on November 25, 2003. The reason given on her termination form was a reduction in force. However, it is undisputed that T-Mobile was not undergoing a reduction in force at the time and T-Mobile asserts the written justification was a clerical error. As indicated on the

other employees' termination papers, these employees, including Berry, were fired for poor performance. Specifically, Berry was repeatedly counseled regarding her failure to employ proper coaching methods and her inability to get along with others. Berry was replaced on an interim basis by Jeff Edmonds, a younger male, and eventually her position was filled by Karen Willis.

On January 6, 2004, Berry filed a charge of discrimination claiming she was fired due to her disability, age and gender. The district court granted summary judgment in favor of T-Mobile. Addressing the ADA claim, the court found Berry's MS was an impairment, but she failed to show the MS substantially affected her major life activities. In the alternative, Berry contended that even if her major life activities were not severely restricted, T-Mobile regarded her disabled as evidenced by its approval of her FMLA request. The district court ruled T-Mobile's approval, in itself, was insufficient to establish that her employer regarded her as disabled. The court concluded Berry failed to establish she was disabled under the ADA.

As to her gender and age discrimination claims, the district court determined Berry established her prima facie case, but failed to rebut T-Mobile's proffered non-discriminatory reasons for terminating her employment. Because Berry did not dispute she had been advised about the stated deficiencies in her performance and that teamwork and accountability were priorities for T-Mobile, her proffered evidence of pretext was insufficient to survive summary judgment.

Finally, the court rejected Berry's breach of contract and promissory estoppel claims, noting Berry's signed employment agreement specified her at-will employment status and there was no evidence of mandatory progressive discipline policies, written or unwritten. Thus, there was no breach of contract and no reasonable reliance on the impact of unwritten policies contradicting the written employment agreement. Berry filed a timely appeal challenging each aspect of the district court's decision. We address each in turn.

## Discussion

The purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995). In other words, there "must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir. 1995). A court grants summary judgment for the moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions, and affidavits. Fed. R. Civ. P. 56(c). When applying this standard, a court must view the factual record in the light most favorable to the non-movant. *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A.      *Whether Berry is "disabled" or "regarded as disabled" under the ADA.*

"To establish a valid claim under the ADA, a plaintiff must first prove by a preponderance of the evidence that she has a disability.[4]  To satisfy the ADA's definition of disability, a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities."  *Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762, 765 (10th Cir. 2006) (citations omitted).  "Whether the plaintiff has an impairment within the meaning of the ADA and whether the conduct affected is a major life activity for purposes of the ADA are questions of law for the court to decide.  Ascertaining whether the impairment substantially limits the major life activity is a question of fact for the jury, although a court is not precluded from deciding the issue on a motion for summary judgment."  *Id.* at n.1 (citation omitted).

1.      Substantial Limitation

The United States Supreme Court defines a "substantial" impairment as one "that prevents or severely restricts [an] individual from doing activities that are of central importance to most people's daily lives" and that is "permanent or long term."  *Toyota Motor Mfg., Ky. Inc. v. Williams,* 534 U.S. 184, 198 (2002)

_____

[4]  The ADA defines the term "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(2).

(citation omitted).  We must strictly interpret the term "substantial" to "create a demanding standard for qualifying as disabled." *Id.* at 197.  The ADA regulations describe "substantially limited" as "[u]nable to perform a major life activity that the average person in the general population can perform;" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(I)-(ii) (2001).  Factors to be considered are:  "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii).[5]  An impairment's effects are assessed on a case-by-case basis. *Holt*, 433 F.3d at 766.  On summary judgment, the ultimate question is whether the evidence presented could allow a jury to conclude the limitations "amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability." *Toyota*, 534 at 202.

Berry contends she is substantially limited in the life activities of caring for herself, walking and performance of manual tasks.  Specifically, Berry alleges she

---

[5]  To date, the Supreme Court has expressly declined to determine the amount of deference due these regulations. *Toyota*, 534 U.S. at 194.

"has to rest before showering, cannot do household chores that are handled by others in the family, and essentially has to plan when things can be accomplished. She also is limited in duration in the amount of time available to her." (Appellant's Br. at 21.) She maintains the district court erred in considering only whether the impairment "severely" restricted Berry from performing the affected major life activities. Berry contends the district court failed to consider "[t]he duration or expected duration of the impairment; and [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(ii)-(iii). While Berry correctly cites the federal regulation, we need not parse the relevant considerations here. Under any of them, Berry is not currently disabled.

The evidence, viewed in the light most favorable to Berry, reveals at the time of her discharge, Berry suffered from extreme fatigue which would cause cognitive difficulties, temporary postponement of activities and, on occasion, result in a fall. However, the medical records submitted by her physician demonstrate her activities were not substantially limited and many of her symptoms could be addressed through medication. When Berry first began treatment with Dr. Frohman she would see him every six months, but eventually her appointments were extended to annual visits. In May 2002, Dr. Frohman proscribed Provigil for Berry's fatigue, an ongoing problem which was exacerbated by changes in her work schedule. During the same visit, Dr.

-11-

Frohman reported Barry was "doing remarkably well" in her daily activities. (Appellant's App. Vol. I at 125.) She was advised, however, to use a straight cane later in the day to prevent "fatigue induced falling." (*Id.*) In Dr. Frohman's 2003 report, he stated Berry had not fallen within the last six months and had benefitted from the Provigil, but still experienced cognitive dysfunction such as short-term memory problems when fatigued. Overall, the doctor reported her daily living activities remain unchanged. Dr. Frohman's 2004 report states Berry received "excellent benefit" from her medication regarding fatigue. (*Id.* at 128.) Her condition apparently remained stable in 2005, when the doctor noted she was doing "remarkably well with . . . no evidence of significant change in her daily activities." (*Id.* at 136.) Indeed, Berry admitted her fatigue level depended on whether she was taking her medication. If she takes the proscribed Provigil, she "has a greater ability to do everything." (*Id.* at 84.) Even in the event the medication did not provide complete relief, her strategy for dealing with her fatigue was to postpone her chores or allow her husband and daughter to complete them.

Compare these facts to those in our recent case, *Holt v. Grand Lake Mental Health Center, Inc.*, 443 F.3d 762 (10th Cir. 2006). There, the plaintiff had cerebral palsy. In determining whether she had a substantial disability, we observed:

While Holt needs help when chopping, cutting, and slicing food, the

evidence is insufficient to allow a factfinder to conclude she is severely restricted in her ability to cook. It is undisputed that Holt occasionally must ask others for assistance when buttoning her clothing; Holt has introduced no evidence, however, that would permit a factfinder to conclude she is severely restricted in dressing herself.

. . .

Holt also claims the limitations caused by her cerebral palsy substantially impair her ability to perform the major life activity of caring for herself. Caring for one's self encompasses normal activities of daily living; including feeding oneself, driving, grooming, and cleaning home. As discussed above, the relevant evidence shows Holt has difficulty with, or is prevented from performing, a limited number of manual tasks. It also indicates Holt sometimes has difficulty chewing and swallowing her food. These specific limitations, however, do not permit a rational factfinder to conclude Holt is prevented from caring for herself or is severely restricted in her ability to care for herself.

*Holt,* 443 F.3d at 767 (internal citation and quotation omitted).[6] Unlike Holt, Berry does not dispute she can perform all daily life activities given sufficient rest, walk with the aid of a cane, can treat her symptoms with medication, and her cognitive difficulty does not prevent her from learning and working. The district

---

[6] *See also Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1204 (10th Cir. 2003):

In support of her claim that her multiple sclerosis limited her major life functions, Appellant argues that she was frequently forced to take unscheduled leave, was frequently unable to lift heavy objects, could not bear "sustained exertion," and could not care for her children, complete household chores, or cook for her family. Appellant alleges that when she is suffering fatigue all of her life's activities are halted.
. . . .
[W]e agree with the district court that Appellant has not shown the substantial impairment of a life activity.

-13-

court did not err in considering her family's assistance with the household chores, as that is part of daily living in most families. Berry's condition has not significantly degenerated over the last several years, and according to her physician, she has stabilized. Thus, while Berry may have to make some adjustments in her daily routine, the district court did not err in finding Berry was not "disabled" as a matter of law.[7]

### 2. Regarded As Disabled

In the alternative, Berry asserts the district court erred in concluding there was no issue of fact as to whether T-Mobile considered her disabled. Berry contends T-Mobile's grant of her FMLA leave request is sufficient to raise a question of fact. We disagree.

Equal Employment Opportunity Commission regulations presents three different ways in which an individual may satisfy the meaning of "regarded as having a disability": (1) the individual may have an impairment that is not substantially limiting but is perceived by the defendant as constituting a substantially limiting impairment; (2) the individual may have an impairment that is substantially limiting only because of the attitudes of others toward the impairment; or (3) the individual may have no impairment at all but is regarded by the defendant as having a substantially limiting impairment. 29 C.F.R.

---

[7] *See Heisler v. Metropolitan Council*, 339 F.3d 622, 628 (8th Cir. 2003) ("[B]ald assertions that one is limited in a major life activity are insufficient to withstand summary judgment.").

-14-

§ 1630.2(l). In addition, a claimant may be deemed to have a "record" of disability either by having a history of substantial limitation of a major life activity or by having been misclassified as having such an impairment. 29 C.F.R. § 1630.2(k).

Because T-Mobile knew Berry had MS and knew of her fatigue and resulting cognitive challenges, Berry argues Kavanah's suggestion she apply for FMLA leave and the approval of her application is evidence that T-Mobile considered her disabled. Although we have found no precedent directly on point in this Circuit or others, we agree with the district court's conclusion that T-Mobile's approval of Berry's FMLA request does not establish a question of fact.[8]

---

[8] An unpublished Tenth Circuit district court case has clearly rejected a contention that recommending FMLA leave establishes an ADA "regarded as" claim. *McKinzie v. Sprint/United Mgmt Co.*, No. 03-2348-GTV, 2004 WL 263444 *7 (D. Kan. Nov. 16, 2004) (supervisor's "awareness of Plaintiff's panic disorder and his belief that she should apply for FMLA leave does not establish a 'regarded as' claim under the ADA") (citing *Bost v. Headco Indus., Inc.*, No. 02-2182-GTV, 2003 WL 21939020, at *5 (D. Kan. Aug. 4, 2003); *Ruggles v. Keebler Co.,* 224 F. Supp. 2d 1295, 1302 (D. Kan. 2002) (citation omitted) (determining that an employer's recommendation to apply for disability insurance did not support the plaintiff's "regarded as" claim because "disability is a term of art under the ADA"); *Gazaway v. Makita U.S.A., Inc.,* 11 F. Supp. 2d 1281, 1288 (D. Kan. 1998) (holding the fact that the employer encouraged an employee to seek counseling established only that the employer was sympathetic to the employee's experience, not that the employer regarded the employee as disabled); *Ellis v. Mohenis Servs., Inc.,* No. 96-6307, 1998 WL 564478, at *5 (E.D. Penn. Aug. 24, 1998) ("[w]hether the defendants believed the plaintiff was eligible for FMLA leave, or believed the taking of such leave was proper under the circumstances, does not demonstrate that they regarded him as disabled" because "an employee who has a 'serious health condition' for purposes of the FMLA is not necessarily 'disabled' under the ADA.").

-15-

An employer's knowledge of an impairment alone is insufficient to establish the employer regarded the employee as disabled. *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1256 (10th Cir. 2001).

We have often stated "[d]isability is a term of art under the ADA." *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 495 (10th Cir. 2000); *Poindexter v. Atchison, Topeka & Santa Fe Rwy Co.*, 168 F.3d 1228, 1230 (10th Cir. 1999). In contrast, the leave provisions of the FMLA are wholly distinct from the statutory definition of "disability" and an employer's reasonable accommodation obligations covered under the ADA.[9] As courts have recognized in various contexts, "there may be some parallels between the ADA and FMLA, but applicable regulations explicitly state that ADA's 'disability' and the FMLA's 'serious health condition' are different concepts, and must be analyzed separately." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1295 (11th Cir. 2006) (quoting *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 861 (8th Cir. 2000); *see also Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 249 (6th Cir. 2004) ("Unlike the FMLA, the finding of a disability is the key 'that unlocks the storehouse of statutory protections' under the ADA."). Given the very different focus of the two statutory protections, Kavanah's suggestion to apply for FMLA leave and T-

---

[9] The FMLA grants an eligible employee the right to take up to twelve workweeks of unpaid leave annually for any one or more of several reasons, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

Mobile's approval of Berry's application does not demonstrate an issue of fact as to whether Berry was considered disabled under the ADA. Consequently, Berry failed to present a case of discrimination under the ADA.

B.      *Pretext*

Berry claims T-Mobile unlawfully discriminated against her based on her gender and age. Because she presented circumstantial evidence to support her claims, we apply the framework set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973). *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir. 2005). "The employee must first establish a prima facie case of a prohibited employment action and if she does, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for its adverse employment action. If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id*. A pretext argument requires the court to "examine the facts as they appear to the person making the decision," to determine whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & County of Denver,* 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotations omitted). Our inquiry does not review the wisdom or fairness of the employer's proffered reasons. *Id*. "[A]t issue is whether the evidence of Plaintiff's misconduct presented to [the decisionmakers] was so weak that a rational factfinder could infer that [the]

expressed reason for terminating Plaintiff must have been pretextual." *Id.* at 925.

The district court determined Berry presented a prima facie case of discrimination on both her claims but failed to demonstrate T-Mobile's proffered non-discriminatory basis for its decision, her performance, was pretextual. Berry contends the district court erroneously resolved issues of fact in reaching its conclusion.

Berry claims pretext is shown by a series of events in context. First, she points to evidence of her satisfactory performance, her raise in September 2003 and Kavanah's October 30th oral assurances and memo approving her performance, and insists any earlier performance difficulties were rendered "non-issues" by her improvement. She then points to the timing; Kavanah's approval was given only three weeks before her termination, which itself occurred just days after she requested accommodation for her fatigue. In addition, she finds it suspicious that Kavanah's original assessment was based on his own observation and that of others, yet his alleged turnaround was based solely on Grier's comments. Consequently, she concludes the district court made a factual determination in favor of T-Mobile when it discounted this evidence solely because there was no evidence rebutting Kavanah's testimony as to his motivation in terminating her employment.

Berry's rendition of the record, however, is incomplete. She fails to mention T-Mobile presented uncontested evidence that her raise in 2003 was an

across-the-board payment adjustment made at all call centers and therefore is not evidence of Kavanah's assessment of her performance. Further, Berry does not deny she was repeatedly counseled regarding her failure to improve her interactions. Nor does she deny Grier's criticism of her performance to Kavanah after October 30. She does not argue the action plan she submitted for her teams and coaches was adequate. Most importantly, Berry misapprehends the tenor of Kavanah's October 30 memo. It does not exonerate all past performance issues. Rather, it affirms her improvement with cautionary advice. Two weeks prior to October 30, Kavanah recorded the substance of another meeting he had with Berry and one of her team coaches. The team coach was called to Kavanah's office, with Berry present, to discuss coaching effectiveness. Kavanah noted that during the meeting "[Berry] did not offer any response, but rather sat silently . . . . and this concerned me about her interaction and coaching . . . ." (Appellant's App. Vol. I at 195) The memo continues:

> After [team coach] left the office . . . . I asked [Berry] why she did not know about [his] shortcomings in advance of this meeting. She stated she had not looked in the blue books (this is my concern of her other coaches too) . . . I directed [Berry] to ensure all her team members' blue books are reviewed by October 28th, and that effective Success Plans are documented by each coach showing the steps that will be taken to help ensure the . . . success and the time frames to achieve such activities.

(*Id.*)

Berry accurately states the October 30 memo records Kavanah telling Berry she was "highly valued" but it also included:

-19-

Follow-up with Barb related to her not feeling valued as a TM . . . . She indicated that she feels that Sue Nichols and Cassandra Shepard are "spies" and looking for questionable behavior of hers.

Barb became teary-eyed as she spoke of this.

I let her know that Cassandra and Sue are clearly not spies, but rather enablers for us to have a strong leadership team, and their role is to observe and give feedback on the + and — of those behaviors. I cited several instances in which Barb's behaviors were conflicting to our direction, and that she was given very valuable, actionable feedback to help her become more effective. I cited several situations where she took that feedback and indeed acted upon it. . . .

I let Barb know that her continued area of improvement is inspecting the coaching ability of her coaches and the documentation in coaches (*sic*) blue books. . . . She agreed and committed to this.

Discussed her high focus on caring for the individual and continually seeing the "bright side" of things in people — almost to a fault. Her trust in her coach's [sic] words is causing serious lapses in their performance due to lack of followup on Barb's part.

She indicated she had a "come to Jesus" meeting with her team and told them they were no longer going to be able to skate by, and not do what was directed by her (finally, a right step by Barb). Discussed ensuring she follows up on deadlines given, and force the accuracy of reports they generate for her. She is giving direction little follow-up. Is this a respect issue? Do her coaches feel she will not follow-up or follow through with them? This stems back to the "holding people accountable" tag she has earned in the site.

Barb and I agreed she would give direction to her coaches with a time frame, and follow-up on that date to see if they have delivered on the expectation.

(*Id*. at 193-94.) These two memos together demonstrate the "issues" prior to

October 30, in this instance holding the employees she supervised accountable,

providing diligent follow up, and interaction with her peers, remained an area of

concern. Berry does not argue these issues were not discussed on October 30 nor does she contest that, after the memos, Grier informed Kavanah that Berry was "telling you what you want to hear but she's not improving." (*Id.* at 189).

Berry also claims the error on her termination papers marking a reduction in force as the reason for her termination indicates pretext. Because poor job performance was also an option in the list of reasons provided on the form, she concludes the paperwork is evidence T-Mobile's "clerical error" excuse is a sham. Berry offers no support for this theory. Nothing in the record suggests a reduction in force occurred at T-Mobile. The paperwork for every other manager fired at the same time as Berry marked performance as the reason for termination. Berry fails to show any benefit to T-Mobile from its mistake. We agree with the district court that this discrepancy does not constitute an inconsistency sufficient to show pretext.

Finally, Berry claims the termination violated T-Mobile's policies and procedures. Berry presents no written policy, but contends T-Mobile had an unwritten progressive disciplinary policy. She relies on Shepard's testimony regarding T-Mobile's approach to discipline.[10] While Shepard testified there were general progressive disciplinary strategies used depending on the employee and

---

[10] Berry also attempts to rely on her own experience as a manager, claiming she was trained she could recommend an employee's termination only after progressive discipline. However, as has occurred throughout Berry's brief, the record cite does not support her assertion.

-21-

the situation, she did not testify T-Mobile had an unwritten specific approach requiring progressive discipline. Indeed, T-Mobile presented substantial evidence that many of its employees had been fired without warning or prior disciplinary measures. Between 2002 and 2004, T-Mobile fired twenty-six team managers, team coaches and senior managers. Of those, twenty-one received no previous discipline.[11] Moreover, even if T-Mobile fell short of Berry's expectation of progressive discipline, this fact adds little to the pretext analysis. "The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual." *Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir.1995) (emphasis omitted). Because it is uncontroverted that T-Mobile decisionmakers did not believe a rigid policy existed, "even if the failure to [follow procedure] was a mistake, it was not pretextual." *Id.* at 455.

Given these facts, Berry failed to show "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [T-Mobile's] proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

C.    *Implied Contract/Promissory Estoppel*

_____

[11] Eighteen were male, seventeen were younger than Berry and twelve were under the age of forty.

Berry was hired as an "at-will" employee as stated in both her letters of employment in 2000 and 2002. T-Mobile's employee handbook contains a conspicuous disclaimer and does not have a provision for progressive discipline. Nonetheless, Berry claims there was an "unwritten policy" that immediate dismissal would only be "for cause" which provides the basis for her breach of implied contract and promissory estoppel claims. Berry also claims she relied on Kavanah's explicit promises he would tell her if her employment was in jeopardy. Berry again relies on Shepard's testimony regarding different levels of corrective action, her testimony that only certain acts, such as violence, would lead to direct dismissal if the dismissal were based on that act alone, and her confirmation Berry did not engage in any activity that would support a direct dismissal and had not received a written or verbal warning or been suspended.

Citing *Evenson v. Colorado Farm Bureau Mutual Insurance Company*, 879 P.2d 402 (Colo. App. 1993), Berry claims she had an employment contract despite the disclaimers in her letter of employment. In *Evenson*, the Colorado Court of Appeals recognized "an employee hired for an unspecified period of time is presumed to be an 'at-will employee' whose employment may be terminated without cause or notice and such termination does not give rise to a cause of action." *Id*. at 408. This general rule does not apply, however, if the employer has limited its right to terminate employees. *Id*. at 408-09. The *Evenson* court noted that, even if there is a conspicuous disclaimer, the manual may create an

-23-

implied contract if it contains mandatory termination procedures or requires "just cause" for termination. *Id*. at 409. Finally, the *Evenson* court held that even if the manual contains a disclaimer and includes language that makes use of the disciplinary procedures discretionary, the contract issue should be submitted to the jury if there is evidence that the employer's supervisors treat the disciplinary procedures as mandatory. *Id*. A mandatory policy is demonstrated by evidence that "the procedures were used in each instance of termination generally" and "the procedures were always used with reference to employees in plaintiff's department or at her level of management in the company." *Mariani v. Rocky Mountain Hosp. & Med. Serv.,* 902 P.2d 429, 435 (Colo. App. 1994).

Unlike *Evenson,* the evidence offered by Berry is insufficient to warrant submission of the issue to a jury. The employee handbook does not contain any reference to a policy of progressive discipline. As noted above, Shepard's statements do not establish an unwritten policy mandating progressive discipline prior to terminating employment. Further, the evidence demonstrates many employees were fired without progressive discipline, including employees at Berry's level of management in the company. Kavanah's assurances to Berry do not change this conclusion. The "promises" he made on October 30 did not alter Berry's at-will status or promise progressive discipline. Thus, Berry could not reasonably rely on his words to restrict T-Mobile's right to terminate her employment with or without cause. As a result, the district court properly

-24-

awarded summary judgment to T-Mobile on this claim.

## Conclusion

Berry failed to demonstrate she was "disabled" under the ADA. Her claims of gender and age discrimination collapse in the face of T-Mobile's evidence that Kavanah terminated her employment because he genuinely believed her performance had not improved despite the repeated efforts of several T-Mobile managers. Finally, Berry presented no evidence T-Mobile or its managers followed an unwritten progressive discipline policy or considered it a mandatory process preceding termination of employment.

AFFIRMED.