**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 5, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAMES MICHAEL WEBSTER,

Plaintiff-Appellant,

v.

CITY OF BIXBY, a municipal corporation,

Defendant-Appellee.

No. 11-5143
(D.C. No. 4:10-CV-00384-GKF-PJC)
(D. N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

When James Michael Webster's position as the Assistant City Manager of Bixby,

Oklahoma, was eliminated, he refused to accept another position which would reduce his

pay by more than $30,000 per year. He sued the City alleging his Fourteenth

Amendment procedural due process rights were violated. The district court entered

summary judgment in favor of the City because Webster, as an at-will employee, did not

---

[*]This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id*.

have a protected property interest in continued employment. The nub of the issue presented to us is whether Webster's employment was "at-will" or something more. We affirm.

## BACKGROUND

Webster's employment with the City began in 1978 when he joined the Bixby Police Department. He worked his way through the ranks, eventually becoming Chief in 1986. He resigned this position in December 2001 and, the next day, began his new position as the Administrative Assistant to the City Manager, Mickey Webb. Webster does not recall Webb getting approval from the City Council to hire him as an administrative assistant in 2001.

In 2004, Webb promoted Webster to the position of Assistant City Manager. The Council approved the appointment at its April 12, 2004, meeting. In May 2007, Webster acknowledged, in writing, having received the Bixby Employee Handbook. It repeatedly stated that all employees were at-will. However, Webb told Webster the "'at-will' employment was a legal nullity largely meant to discourage litigation, and that he could only be removed from office of Assistant City Manager for cause and on the basis of merit and fitness alone." (Vol. II at 465.)

Webb resigned as City Manager in May 2009. Blu Hulsey started as the new City Manager in July 2009.[1] After becoming familiarized with Bixby's operations, Hulsey determined he needed a Code Enforcement Officer, not an assistant. On July 14, 2009,

_____

[1] The council appointed Rebecca Byers, the City Clerk at the time, to be acting City Manager during the interim.

Hulsey told Webster he was eliminating the Assistant City Manager position. He offered

Webster the Code Enforcement Officer position at an annual salary of $52,000 per year –

over $30,000 less than Webster's Assistant Manager salary. Hulsey gave Webster until

the next day to make his decision. On July 15, Webster met with Hulsey and told him he

"would have to go with the flow." (Vol. 1 at 148.) Hulsey said he did not want him to go

with the flow but wanted him to be a productive member of the staff. Webster agreed.

Hulsey then notified the personnel department of Webster's change in position and

salary.

On July 16, Webster met with Hulsey and the City Planner to go over the details

of his new position. Webster did not ask any questions or raise any concerns. However,

the next afternoon he called Hulsey, saying he had decided to keep his position as

Assistant City Manager and was not resigning. In reply, Hulsey said he would call the

City Attorney before responding. Later that afternoon, Hulsey came to Webster's office

with the police chief and an officer. Hulsey told Webster to turn in his keys and gave

him a letter reading:

> On July 14th we discussed moving you to the position of Acting Code
> Enforcement Officer for the City of Bixby. You accepted this position on
> the 15th of July. Today you placed a phone call to me around 4pm stating
> that you were withdrawing your acceptance of this position. I am treating
> this decision as a resignation of employment. The City will give you two
> weeks of pay and benefits at the rate of the Acting Code Enforcement
> Officer with the final date of termination being July 31st. Please turnover
> [sic] all City property to the personnel office immediately. If you have any
> questions please contact [the City Attorney].

(Vol. I at 194.)

In his suit against the City, Webster claimed, in relevant part, it had: (1) deprived him of his procedural due process in violation of the Fourteenth Amendment; and (2) failed to pay accrued vacation and sick time in violation of the Okla. Stat. Ann. Tit. 40, §§ 165.1 *et seq*.  The City moved for summary judgment on both claims.  Webster filed a cross motion for partial summary judgment on the due process claim.  The district court concluded Bixby's city charter did not vest a property interest in Webster's Assistant City Manager position and he remained an at-will employee as set forth in the City's employee handbook.  It also determined the City properly paid Webster's accrued vacation and sick leave based on his salary as Code Enforcement Officer.

Webster appeals from the district court's resolution of his due process claims.  He does not raise his wage claim on appeal.[2]

## DISCUSSION

"We review a summary judgment grant de novo, viewing the evidence in the light most favorable to the nonmoving party."  *Robert v. Bd. of Cnty. Comm'rs. of Brown Cnty. Kan.*, 691 F.3d 1211, 1216 (10th Cir. 2012) (quotation marks omitted).  Summary judgment is only appropriate if there is no dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56( a).

---

[2]  Webster filed his wage claim with the Oklahoma Department of Labor on August 24, 2009.  On October 1, 2009, the Department dismissed his claims as "unjustified according to statute or rules."  (Vol. I at 13.)  His complaint amounted to an appeal from that order.  The district court affirmed the Department's decision.  (Vol. II at 708.)

The Fourteenth Amendment protects citizens from the deprivation of "life, liberty, or property, without due process of law. . . ." U.S. Const. amend. XIV, § 1. "[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision . . . ." *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.,* 936 F.2d 483, 490 (10th Cir.1991). "To determine whether a plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). The parties agree Webster was given no level of process, so the question becomes whether he had an interest protected by the Fourteenth Amendment.

Property interests are not derived from the Constitution, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "The standard for the existence of a property right in employment is whether the plaintiff has a legitimate expectation of continued employment." *Hennigh*, 155 F.3d at 1253. Webster claims he has a property interest in his Assistant Manager position for two reasons: (1) Section 3.4 of the Bixby City Charter confers the expectancy of continued employment as a matter of law; and (2) he could rely on Webb's assurances in 2007 that the at-will provisions of the Employee Handbook did not apply to him.

- 5 -

A.     Bixby's City Charter

Bixby is a charter municipality which draws its legal vitality from Article 18 §

3(a) of the Oklahoma Constitution, and from the implementing Code provisions, Okla.

Stat. Ann. Tit. 11, §§ 10-101 – 10-121.[3]  *See State ex rel. Trimble v. City of Moore*, 818

P.2d 889, 898 (Okla. 1991).  "[T]he charter has the force of the City's fundamental law."

*Id.*  "Under the '*home rule*' doctrine, a city charter supersedes conflicting state law on

matters of purely municipal concern."  *Id*. (footnote omitted).

Section 3.4 provides:

City Manager – Powers And Duties

The City Manager shall be the chief administrative officer and head of the administrative branch of the city government.  He shall execute the laws and ordinances of the city and administer the government.  The City Manager shall have the special powers and duties herein enumerated, and shall be directly responsible to the council for the proper administration thereof, to-wit:

(a) To insure that all laws and ordinances governing the city of Bixby are enforced.

(b) To appoint and *remove* all directors or heads of departments and all *subordinate officers* and employees in such departments, *subject to the majority approval of the council*. The following department heads shall be

---

[3]  Section 10-101 provides:

The form of government provided by Sections 10-101 through 10-121 of this title shall be known as the statutory council-manager form of city government. Cities governed under the statutory council-manager form shall have all the powers, functions, rights, privileges, franchises and immunities granted, or which may be granted, to cities. Such powers shall be exercised as provided by law applicable to cities under the statutory council-manager form, or if the manner is not thus prescribed, then in such manner as the council may prescribe.

subject to the terms of this section:

1. City treasurer

2. City clerk

3. Police chief

4. Fire chief

5. Director of public works

6. All other departments created

Appointment and *removal* under this section *shall be made upon the basis of merit and fitness alone*, including proper subordination.  Preference shall be given to home labor when same is available.

(c) To exercise actual management, control and supervision of all departments of the city government, and to exercise all other administrative function, except as otherwise provided in this charter.

(Vol. I at 216-17) (emphasis added).  Webster contends, as a "subordinate officer," the charter unambiguously limited Hulsey's power to remove him from his office because it required the removal to be by "majority approval of the council," and based upon "merit and fitness."  (Appellant's Br. at 48, 49.)

The City's argument relies on the language in the next sentence: "The following department heads shall be subject to the terms of this section."  Sec. 3.4 (b).  It maintains "[t]he unambiguous language of § 3.4 provides heightened protections (council approval and "for cause" determination) for six enumerated department heads" and does not apply to all employees as Webster asserts.  (Appellee's Br. at 13.)  Construing the charter as a whole, the district court agreed with the City.

In Oklahoma, as elsewhere, "[t]he primary goal of statutory construction is to ascertain and follow the intention of the [enacting authority]."  *Zaloudek Grain Co. v.*

*CompSource Okla.*, --- P.3d ---, No. 110,662, 2012 WL 4077382 at \*2 (Okla. Sept 18, 2012) (quoting *TRW/Reda Pump v. Brewington,* 829 P.2d 15, 20 (Okla. 1992)).  Plain and unambiguous language which expresses a clear meaning "will be accorded the meaning expressed by the language used." *Id.*  "However, where a statute is ambiguous or its meaning uncertain it is to be given a reasonable construction, one that will avoid absurd consequences if this can be done without violating legislative intent." *Id.*  Oklahoma courts will not construe "an inept or incorrect choice of words . . . in a manner to defeat the real or obvious purpose of a legislative enactment." *Id.*

Webster relies on the rule of grammatical construction which provides "[t]he placement of the comma before the modifying phrase, where it is preceded by a series which is separated by commas, indicates an intent to apply the modifying phrase to each part of the series." *Walkingstick v. Muskogee Regional Med. Ctr.*, 992 P.2d 924, 926 n.2 (Okla. Civ. App. 1999).  Because the phrase "subject to the majority approval of the council" is preceded by a comma, he contends it must "apply to all items in the series -- the appointment and removal of all directors, department heads, **and all** subordinate officers*,* and employees." (Appellant's Br. at 48.)  Further, he argues the third sentence of § 3.4(b) does not limit its application to the six named department heads.  "Rather, the plain language . . . unequivocally mandates that 'merit and fitness alone' be the basis of **any** '[a]ppointment and removal **under this section.**'" (*Id*. at 49.)

According to Webster, the district court erred in rejecting his interpretation.  First, the language of the provision can be read only one way.  Second, the court's reliance on deposition testimony interpreting the provision differently is improper in light of the

provision's unambiguous language.  Finally, the court's conclusion that Webster's

interpretation could not be reconciled with § 2.4 of the charter is wrong.

Section 2.4 provides in relevant part:

Council: Appointment And Removals

Neither the council, the mayor, nor any of its other members may direct or request the appointment of any person to, or his removal from, office or employment by the [C]ity [M]anager or by any other authority; or, except as provided by this charter, participate in any manner in the appointment or removal of officers and employees of the city.  Except for the purpose of inquiry, the council and its members shall deal with the administrative service solely through the [C]ity [M]anager; and neither the council nor any member thereof may give orders on administrative matters to any subordinate of the City Manager whether publicly or privately.

(Vol. I at 212.)

The district court found it impossible to reconcile § 2.4 with § 3.4(b) under

Webster's construction.  Section 2.4 prohibits the council from participating "in any

manner in the appointment or removal of officers and employees of the city."  (Vol. I at

212.)  In contrast,  § 3.4 confers "broad designation of authority . . . to the [C]ity

[M]anager" in personnel matters.  (Vol. II at 706.)  The court concluded Webster's

"tortured interpretation . . . flies directly in the face of the judicial mandate to construe

the different provisions together to effect a harmonious whole and give intelligent effect

to each."  (*Id*. at 706-07) (quotation marks omitted).

Webster argues the district court failed to recognize the distinction between the

power to appoint and the power to approve.  He maintains the appointment decision

always remains with the City Manager.  The council's power to approve occurs only after

the City Manager has made the appointment. The two provisions can be reconciled under their plain meaning without doing harm to either.

While Webster's reading of the clause in § 3.4 "is quite sensible as a matter of grammar," and we do not dispute there is a difference between the authority to appoint and the authority to approve, his conclusion that there is only one way to read the provision "is not compelled." *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 330 (1993).

Looking at the entirety of § 3.4 and the charter as a whole, the language is ambiguous. "The test for ambiguity in a statute is whether the language is susceptible to more than one reasonable interpretation." *Wilder v. Okla. Tax Comm'n.*, No. 109,532, 2012 WL 4903035, *6 (Okla. Civ. App. May 25, 2012). Webster's construction fails to account for the specific language which declares the section applies to "the following department *heads*." Sec.3.4(b). The question is whether the intent of the two sentences, together and within the provision as a whole, was to the delineate the full scope of the City Manager's authority to hire and fire while preserving certain protections for department heads, or whether the entire section was to apply to all employees in the administrative branch.

Because the charter is unclear, "we may resort to available sources of interpretative assistance to determine the Legislature's intent." *Cox v. Dawson*, 911 P.2d 272, 277 (Okla. 1996). "[I]n interpreting an ambiguous statutory provision we look to the purpose and intent of the statutory scheme." *Jones v. Purcell Inves., LLC*, 231 P.3d 706, 713 (Okla. Civ. App. 2009). The preamble of the charter states its purpose is "to provide for more efficient, adequate, and economical government." (Vol. I at 207.)

Looking to the charter as a whole, the intention to separate the City Manager's administrative duties from the council's policy decisions is apparent. *See* § 2.1(f) ("the City Manager shall fill all vacancies where this charter provides for the appointment to be made by the City Manager"); § 2.3 ("the determination of all matters of policy, shall be vested in the council."); § 2.4 ("the council and its members shall deal with the administrative service solely through the City Manager"); § 3.4 ("The City Manager shall administer the government" and "exercise actual management, control and supervision of all departments of the city government"); § 3.5 ("Where the power to appoint individuals has been delegated to the City Manager pursuant to the terms of this charter, no member of the council shall make recommendation to the City Manager for the appointment of said individuals, unless such recommendation is requested by the City Manager.").

We need not turn a blind eye to the practical application of Webster's interpretation. *See Nobelman*, 508 U.S. at 331 (looking to the practical application of petitioners' statutory interpretation). The council's involvement in approving every hire and termination in the five listed departments would not promote efficient government. Moreover, "[a]n ambiguous statute must be given an interpretation that will insure [a] just and uniform operation." *Wilder*, 2012 WL 4903035 at *9 (quotation marks omitted). Webster's construction would confer "for cause" employment on the various administrative department employees, but employees in the same positions in other city departments, such as the "Department of Law," would not be so protected. *See* Charter, Article 5, §5.1 (Vol. I at 223-24.)

Finally, we note Webster was not employed within any of the departments listed in § 3.4. These departments are created in § 2.18, § 4.3 and § 4.1 of the Charter. Section 2.18 provides: "There shall be a police department, a fire department, a department of public works, a department of law, and other administrative departments . . . as the council may establish." (Vol. I at 215.) Section 4.3 creates the Department of Finance headed by the City Treasurer, and the accounting duties of the City Clerk are contained in §4.1. In contrast, the Charter identifies the City Manager as "head of the administrative *branch* of the government" and his duties are to oversee the operation of the various departments. (Vol. I at 216.) Webster does not explain how his position as Assistant City Manager placed him within the scope of § 3.4 as a subordinate officer in any of the listed administrative departments.

As the Oklahoma Supreme Court recognized over 100 years ago:

We are familiar with the rules and cases on statutory construction declaring the doctrine that where the statute is plain and unambiguous there is no room for construction by the courts . . .; but the very warp of the woof of the whole law on the subject of the construction of written laws is . . . as follows:

A thing within the intention is regarded as within the statute though not within the letter, and a thing within the letter is not within the statute unless within the intention. The several provisions of the statute should be construed together in the light of the general objects and purposes of the enactment, and so as to give effect to the main intent, although particular provisions are thus construed not according to their literal reading. The intention is to be gathered from the necessity or reason of the enactment, and the meaning of words enlarged or restricted according to the true intent. That which is implied is as much a part of the statute as that which is expressed. When the literal enforcement of a statute would result in great inconvenience and cause great injustice, and lead to consequences which are absurd and which the Legislature could not have contemplated, the courts are bound to presume that such consequences were not intended, and

- 12 -

adopt a construction which will promote the ends of justice and avoid the absurdity.

*Town of Eufaula v. Gibson*, 98 P 565, 569 (Okla. 1908). These words still resonate.

After examining the difficulties with Webster's grammatical interpretation of the Charter, we think the City's construction of the City Manager's powers and duties is the more reasonable one in light of the charter as a whole and its purpose. The district court did not err in refusing to construe the city charter in a manner which would "defeat the real or obvious purpose of a legislative enactment." *Wooten v. Hall,* 442 P.2d 334, 336 (Okla. 1968).

B.      Employee Handbook

Webster argues he had a separate and legitimate expectation of continued employment: Webb, acting as the City Manager, told him he was not bound by the at-will employment provisions of Bixby's employee handbook. "Under the implied contract restrictions of the freedom to discharge an at-will employee, courts have found from particular facts that the parties had intended a contract of *permanent employment* or one of tenured job security." *Hinson v. Cameron*, 742 P.2d 549, 554 (Okla. 1987). An employee's "detrimental reliance on oral assurances" is one factor which is considered when "evaluat[ing] whether an implied contract right to job security exists." *Id*. at 555.

In 2007, Webster signed an "Acknowledgement of Employee Handbook Receipt." (Vol. I at 202). The acknowledgement stated:

> I have entered into "at-will" employment with the City of Bixby voluntarily and acknowledge that it is for no specified length of time. Accordingly, either I or the City of Bixby may terminate the employment relationship at will, with or without cause, at any time, for any reason or no reason. I

understand that neither this Handbook nor any other City of Bixby policy, practice or procedure is intended to provide any contractual obligations related to continued employment, compensation or employment contract.

Since the information, policies and benefits described here are necessarily subject to change, I acknowledge that revisions to the Handbook may occur, except to the City of Bixby's policy of employment-at-will.

(*Id.*)

The "at-will" policy is also contained in the body of the handbook under

"Conditions of Employment":

"AT-WILL" Employees

Employment with the City of Bixby is "at will," which means employment is subject to termination by either the City or the employee at any time, for any reason. There are no contractual relationships between the City and an employee. Letters, benefits, policy statements, performance appraisals, employee handbooks, or other communications should not be interpreted as contracts. No one has the authority to enter into any oral or written employment contract without the explicit written approval of the City Manager.

(*Id.* at 199). The Introduction also states, "Any written or oral statement by a supervisor contrary to the Employee Handbook is invalid if not signed or approved by the City Manager, and should not be relied upon by any employee." (*Id.* at 197.)

To support his argument Webster relies on Webb's affidavit. It says that at the time Webster signed the "acknowledgement of receipt," Webb told Webster he "would not be bound by it, that the acknowledgment regarding 'at will' employment was a legal nullity largely meant to discourage litigation, and that [Webster] could only be removed from the office of Assistant City Manager for cause and on the basis of merit and fitness alone." (Vol. II at 465.) Webb further averred: "To the extent that my statements to Webster were contrary to the 'at-will' employment language in the [Handbook or the

Acknowledgement], such statements by me changed, modified, and/or suspended the written policy, and at the same time constituted my validation and approval of such changes/modifications." (*Id*.) Webster contends Webb's affidavit conclusively established that Webb effectively waived the at-will policy for Webster's position as he was permitted to do as City Manager.

The district court was not persuaded; it found these statements were no more than Webb's "opinion of the legal effect of [Webster's] signed acknowledgment." (Vol. II at 703.) Webster disputes this conclusion. He argues, because Webb "specifically intended" for Webster to rely on his assurances, the affidavit created, at the least, a material issue of fact precluding summary judgment. (Appellant's Br. at 61.)

"To survive summary judgment, [a] nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010) (quoting *Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir.1995)). Even if based on personal knowledge, Webb's statements merely reach the legal conclusion Webster espouses. The affidavit does not say Webb "specifically intended" Webster to rely on his statements, as Webster claims. Rather, it says: "Once I approved (either orally or in writing) or signed off on such oral statements, and to the extent that it was not unlawful, the [a]ffected employee could then reasonably rely on such statement, despite it being otherwise contrary to the Employee Handbook or other city policy." (Vol. II at 465.) In sum, Webb's affidavit is exactly the type of conclusory affidavit "insufficient to overcome summary judgment." *Skrzypczak*, 611

- 15 -

F.3d 1244. Moreover, since Webb's statements were contrary to the Employee Handbook and were not in writing, Webster could not reasonably have relied upon them. *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1223 (10th Cir. 2007) (determining promises did not alter at-will status).

Finally, Webster claims the district court erred in requiring Webb's oral statements to be in writing. He claims it is unreasonable to require Webb to get written approval from himself. However, the handbook specifically provides that: "<u>No one</u> has the authority to enter into any oral or written employment contract without the <u>explicit written</u> approval of the City Manager." (Vol. I at 199) (emphasis added). The reasoning behind such prohibition is self-evident; significant deviations from basic city policy should be memorialized.[4]

Webster did not have a protected property interest in continued employment with the City. The district court's grant of summary judgment is AFFIRMED.

**Entered by the Court:**


**Terrence L. O'Brien**
United States Circuit Judge

---

[4] The irony of this contention surely does not escape Webster. He claims the City Manager could abolish a crucial employment policy with a remark yet the same manager does not have the authority to hire his secretary without approval from the council.